23 N.J. Super. 265 (1952)
92 A.2d 876
FRANK KOLONKIEWICZ, PETITIONER-APPELLEE,
v.
W. AMES & COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Hudson County Court Law Division.
Decided November 21, 1952.
*266 Mr. Joseph M. Thuring, attorney for the petitioner-appellee.
Mr. R. Robinson Chance, attorney for the respondent-appellant.
*267 DUFFY, J.C.C.
This is an appeal by respondent from a determination in the Division of Workmen's Compensation wherein an award was made on the basis of total permanent disability. Petitioner has filed a cross-appeal under which he seeks a larger award of temporary disability compensation than that allowed him below.
The record shows that on July 28, 1949, in the course of his work as a welder, some hot metal fell into the shoe of petitioner causing a burn to his left foot. He was then 58 years of age. He was treated at home by Dr. Soloman, a company physician, for about a month. Although he returned to work, he remained under the weekly care of Dr. Soloman for treatment of the burn for the next eight months. On November 6, 1950 his foot again bothered him. He visited the doctor and was found to have a "chronic ulcer" at the site of the burn.
The testimony shows that petitioner had suffered from varicosities of both lower extremities for many years. He stated that in 1944 an operation, consisting of a one-inch cutting, had been performed upon a varicose vein in his right leg. He also admitted that "the veins in both legs were kind of lumpy" prior to the burning episode, but insisted that he was able to ambulate and perform all his usual activities without difficulty.
As a result of the examination and diagnosis by Dr. Soloman, petitioner was admitted to the Medical Center on November 11, 1950. A sapheno-segmental ligation of the left leg was performed to aid the varicosity and a skin graft was applied to the dorsum of the left foot. The skin was obtained from petitioner's left thigh. He was discharged from the hospital December 14, 1950.
Petitioner was re-admitted to the hospital on January 4, 1951 on his complaint that the skin graft was breaking down and his foot was painful. In March a left lumbar sympathectomy was performed to improve the arterial circulation. On May 1, 1951 his left leg was amputated at the *268 mid-calf. He was discharged from the hospital, August 13, 1951.
Since his release from the hospital petitioner stated that he has been under the care of his own doctors and visiting nurses for alleviation of the pain in the stump and discomfort in his right leg. Early in 1952 he spent two weeks in Bayonne Hospital seeking relief. Although equipped with two crutches, petitioner attributed his inability to ambulate to pain in his right foot which becomes more intense as he proceeds; to a dizziness which recurs while attempting to walk; and to a sense of fear predicated on two falls which he had experienced. He also complained of extreme nervousness, inability to sleep and a general feeling of distress and wretchedness.
Respondent resists the claim mainly on the ground that petitioner's burn condition was completely healed when Dr. Soloman pronounced him cured and discharged him from further treatment on March 28, 1950. It contends that petitioner is personally responsible for any subsequent disability because it flows from his wearing a tight shoe. In support of this position it offers the testimony of Dr. Soloman regarding the November 6, 1950 visit, "Well, the patient told me that he bought a new pair of shoes three weeks ago and had * * *. The new shoe had rubbed on the anterior surface of the left foot and the same previous condition broke down and became infected."
Returning to petitioner's proofs, a number of medical witnesses appeared on his behalf. Dr. Visconti described his findings, based upon two examinations of petitioner, as "an amputation of the left leg below the knee; skin graft of the left mid-thigh; atrophy of the left thigh area; postoperative scar of the left femoral area, the result of ligation of the saphenous veins; and scarring of the left abdominal region, the result of a left lumbar sympathectomy." He also found him to have "a faulty peripheral circulation, not only to the arterial blood supply but also the venous blood supply." It was the doctor's opinion that "the burn in question did *269 precipitate and cause and ultimately culminate in his one hundred percent total disability." He stated that he based this conclusion on the hypothesis that the burn had not completely healed, that it had destroyed the balance in his circulatory system, for proof of which he pointed out that the site had subsequently reopened. He described what he meant by complete healing following a burn: "You have a condition of inflammation. After that is completely resolved the skin closes over. There isn't a thing that can be seen. It is completely healed. * * * Now, if it isn't completely healed, he has skin tissue; he has disturbed circulation; there is extreme sensitiveness, and it reopens and recurs." On cross examination, in reply to an inquiry about the effect of tight shoes upon the described condition, the doctor said,
"I will admit that the pinching of the shoes certainly contributed to the man's ultimate disability. But it wasn't the real presenting and effective contributing cause in my opinion, in view of the fact that he had a burn; in view of the fact that the burn never completely healed, but reopened; that they had to give him a skin graft; that they did a lumbar sympathectomy; that they tide off the saphenous veins. They did everything humanly possible to try to preserve the delicate balance. And with all that, he still had to have the leg amputated. And had it not been for the burn, he certainly would not have come to the end result at the time he did."
Dr. Siegel testified for petitioner regarding his neurological examination. He said he found him to be suffering from an anxiety neurosis which he estimated to be 15% of total disability and considered it to be causally related to the incident of July 28, 1949 under the hypothesis presented.
Dr. Marcus, appearing for petitioner, testified to his findings based upon an examination made on January 12, 1952. In the main his findings were similar to those reported by Dr. Visconti. He answered the hypothetical question regarding causal relationship in the affirmative and estimated the disability to be 100 per cent of total. In respect to the recurrence of the condition despite an eight month interval since being pronounced cured by Dr. Soloman, the witness testified,
*270 "Q. Well, now, did you, in forming your conclusion attach any significance to the fact that the man's original wound from the 1949 accident was pronounced healed by Doctor Soloman?
A. I attached significance to the fact that it healed; however, with the physiological stress and strain later and with the impaired circulation, the wound had not healed sufficiently and it broke down again.
Q. Well, does eight or nine months have no weight with you on the reasonable possibility and probability that something besides the original accident may have been the cause of the ultimate condition, particularly having in mind that this man had thrombophlebitis, according to you, on both sides and arteriosclerosis on both sides?
A. I will add that his circulatory status, which was not normal  with the healing of this wound for a period of eight to nine months, although it healed, it healed superficially with granulation tissue. However, the impaired circulatory condition this petitioner has was not sufficient to cope and to maintain that healing and the wound just broke down again."
Dr. Soloman testified for respondent. He described the accidental injury as "a second degree burn about two by two inches on the anterior or dorsal surface of the foot. There was considerable swelling and the area was tender to touch." He related the treatments prescribed during the ensuing months and expressed the opinion that the condition was completely healed on March 28, 1950. He described his finding in the November 6, 1950 examination as a "two by two inch deep ulcer" located at the site of the original burn together with marked varicosities of the lower extremities. He recounted the history of the tight shoes (quoted earlier) which he obtained from petitioner. He reiterated his opinion that the condition was completely healed on March 28, 1950 and estimated the disability at that time to be 2% permanent of the left foot.
Dr. Yaguda, testifying for respondent, stated that he had examined petitioner on October 5, 1951. He described at length his physical findings and expressed the opinion that "Mr. Kolonkiewicz is suffering from generalized arteriosclerotic disease with bilateral peripheral vascular disease on an arteriosclerotic basis." It was further his opinion that the *271 tight shoe irritated the skin and caused an infection which culminated in the amputation. He expressed this conclusion, as follows:
"Therefore, it is my opinion that the amputation was caused, or necessitated by several things. First of all, the marked peripheral vascular disease, which is a generalized condition, and which is present on both sides. And, secondly, the introduction of infection in that foot which was already in a state of poor circulation, so that it could not fight the infection with the resulting gangrene and which necessitated his amputation due to infection."
On cross-examination the doctor admitted that there was probably some infection resulting from the burn, saying,
"Well, there was probably some superficial infection in that area; and also the healing was retarded because of the lack of circulation. But it is very likely there was some infection. It is very likely. There is almost always, on a superficial burn, some infection."
Dr. Stockfisch, testifying for respondent, estimated the neuropsychiatric disability at 2 1/2% of total.
At the close of the hearing below the deputy director made an award of three weeks temporary disability to petitioner and found him to be totally and permanently disabled.
It has long been established that an employer takes his employees with their mental, emotional, glandular and other physical defects or disabilities. Marshall v. C.F. Mueller Co., 135 N.J.L. 75 (Sup. Ct. 1946). Although it appears from the record that petitioner had long suffered from varicosities of the lower extremities, arteriosclerosis and a bilateral peripheral vascular disease, no proof was offered that they impaired his working ability prior to the accident of July 28, 1949. And the fact that the accident caused them to flare up and produce greater disability than would normally follow does not relieve the employer of the full consequences of the employment-produced mishap, Sanderson v. Crucible Steel Corp., 3 N.J. Super. 209 (App. Div. 1949), Kalson v. Star Electric Motor Co., 15 N.J. Super. 565 (Cty Ct. 1951).
*272 It has also been established that a workman does not have to be bedridden to be totally and permanently disabled, Jersey City Printing Co. v. Klochansky, 8 N.J. Super. 186 (App. Div. 1950). The fact that only one member is involved does not prevent such a finding, Simpson v. N.J. Stone & Tile Co., 93 N.J.L. 250 (E. & A. 1919); Coates v. Warren Hotel, 18 N.J. Misc. 363 (Com. Pl. 1940).
After careful consideration of the record it is my opinion that petitioner is totally and permanently disabled. I am satisfied that the amputation and ensuing disability are causally related to the accident which occurred on July 28, 1949.
As to petitioner's cross-appeal seeking additional temporary disability compensation, respondent contends that it should be dismissed on the ground that it was not filed within the 30-day period designated by the statute, R.S. 34:15-66, as amended. The determination below was signed by the deputy director July 31, 1952. The cross appeal was filed with the county clerk September 10, 1952 which obviously was beyond the time allotted by the statute. Petitioner relies upon Rule 1:2-5, as amended, which provides:
"Time for Appeal
Where an appeal is permitted, it shall be taken to the appropriate appellate court within the following periods of time after the entry of the judgment, order or determination appealed from: * * *
(b) Final agency decisions, 45 days; except here the time shall run from the date of the service of the decision of the agency."
The question thus presented is whether the determination of the Division of Workmen's Compensation falls within the category of a "final agency decision." However, Rule 3:81-8 provides, in part, "Review of the final decision or action of any State Administrative Agency shall be by appeal to the Appellate Division." It is obvious that under the construction of the language of Rule 1:2-5 sought by petitioner all appeals from determinations in the Division of Workmen's Compensation would be directed to the Appellate *273 Division and not to the County Court as provided in R.S. 34:15-66. Such construction would also offend Rule 5:2-6 which describes the procedure for the trial of Workmen's Compensation appeals in the County Court.
It is my opinion that petitioner's cross-appeal was not filed within the proper time. It will, therefore, be dismissed.
Counsel may present, on proper notice, proposed findings of fact, conclusions of law and form of judgment consistent with the foregoing which should embrace also the details of non-issuable matters such as the compensation rate and the like.