## JOHN BURROCK, PETITIONER-APPELLEE, v. TUNG SOL LAMP WORKS, INC., RESPONDENT-APPELLANT.

Essex County Court
Law Division

Decided April 29, 1954.

*Messrs. Gross & Blumberg (Miss Mabel L. Richardson* appearing), attorneys for petitioner-appellee.

*Messrs. Shaw, Hughes & Pindar (Mr. William T. McElroy* appearing), attorneys for respondent-appellant.

GAULKIN, J. C. C.  Petitioner was awarded compensation and respondent appeals.  Respondent poses three questions. Did petitioner prove the happening of an accident?  If so, did he prove it caused the detached retina and the consequent blindness of his right eye?  And if so, was he entitled to an award of 100% loss of vision of the affected eye?  The questions, none of which are free from difficulty, will be taken up in that order.

Petitioner was an electrician, employed by respondent since 1942.  He testified that on July 30, 1950, assisted by a helper, Thomas Bicksha, he was engaged in removing and replacing temporary wiring, strung over a girder 10 to 15 feet high.

At about 11 A. M. he cut one of the wires, having been informed the wires were "dead," and received a 500 volt shock. However, there is practically no testimony causally relating this shock with the detached retina. Petitioner and Bieksha went to look for the foreman to report the happening, but he was not then present, having left the premises with another injured workman.

Petitioner shook off the effects of the shock and continued with his work. At about 3 P. M. on that day he "yanked" the wires down. They came down "in a spray" and one of the wires struck him in the area of the right eye. The precise point of impact is not clear from the testimony, largely because the witness and counsel used general terms which do not carry uniform and precise meanings. This is no criticism of the witnesses or of counsel—they spoke as laymen normally speak—but now that it is sharply disputed where precisely the blow fell, the inadequacy of the expressions becomes apparent.

For example, the petitioner first said the wire struck him "just below the right eye." The deputy director asked the witness "did any part of the wire strike the eye itself," which to the witness may have meant (as it would have meant to me) the naked eye, to which the witness replied "It didn't strike the ball of the eye" (i. e., the naked eye). "It struck the right eyebrow * * * in this section right here." Obviously the witness was not using the term "eyebrow" as meaning only that area above the eye socket which is covered by hair, for Mr. Pindar himself described the point as "just below the right eyebrow, and it is over the right eyeball."

Apparently the blow was in an area which many people—and I—would call the eyelid. Dr. Grant called it "the right upper lid," and Dr. Clark pointed out that when one is struck in this area "you can't be too accurate within millimeters."

The wire was an insulated wire about the thickness of a man's "pinky."

Petitioner testified that at the moment he was struck he was alone. His helper Bieksha was out of the room, putting away some material, but Bieksha testified that when he

returned he found petitioner with his hand over his eye, and petitioner told him he had been struck by a wire.

Bieksha was cross-examined about an allegedly contradictory written statement given to respondent's investigator. Although petitioner's counsel asked that the statement be put in evidence, and respondent's counsel promised to do so, it was not done. Without it the cross-examination is ambiguous and insufficient to discredit Bieksha, whom the deputy heard and believed.

Just before three o'clock, and before the alleged blow from the wire, petitioner did see the foreman. Nevertheless, after this blow he did not look for the foreman, as he had after the shock earlier that day. Indeed he did not tell anyone connected with respondent (except Bieksha) about the blow to his eye until he was in the hospital awaiting the first operation upon his eye, when he told the foreman, Mr. Marsh, who was visiting him.

The petitioner testified that for two weeks following the blow, though he continued to work, he had a "sandy" feeling in his eye. He bathed his eye every evening, but on or about August 15 his eye filled with fluid, and at 2 P. M. he quit work and went to see Dr. Grant, who was away. Dr. Fissell was taking Dr. Grant's calls, so he went to see Dr. Fissell.

Dr. Fissell testified "I saw he had a detached retina and I asked him had he been hit on the eye." Apparently Dr. Fissell believed trauma could cause a detached retina. Petitioner answered, said Dr. Fissell, "that about three weeks ago while at work cutting a piece of wire, I hit the top of my right eye with a scissors."

Petitioner denied he told Dr. Fissell that. He claimed he told Dr. Fissell that he had struck his cheek bone while cutting asbestos, and that he thought of that in replying to Dr. Fissell's inquiry because his eye was filling from the bottom and "I kept thinking that it was something below the eye that must have been busted that filled the eye up with fluid."

Dr. Fissell immediately ordered petitioner to the hospital.

When Dr. Grant returned he took over the case, and three

or four days after petitioner entered the hospital, Dr. Grant came to see him. At that time, said petitioner, he told Dr. Grant he had been struck in the eye. He said that "as I lay down in the bed I had a chance to think over what happened * * * it came and it dawned upon me that I was hit with this wire above my eye." In this connection it is interesting to note that in the hypothetical question to petitioner's Dr. Harris, petitioner's counsel said:

"I first want to add that the petitioner, on seeing the first doctor at 11:00 o'clock that night, believing this eye had filled in from the right hand portion, in answer to the doctor's question as to what had happened to him, thought of an incident when he had struck his cheek with a pair of scissors at work while cutting some material. Subsequently, when he was hospitalized and Dr. Grant saw him and explained to him that what he thought was happening to the lower portion of the eye was actually in reverse and that he was really being attacked, as it were, from above—that the difficulty was above and it was then that he remembered the incident of July 30th when he received a shock earlier in the day and was struck by the whiplashing wire in that right eye under the right eyebrow and over the right lid and he told the doctor about that."

Dr. Grant testified that he received the history of the blow to the eye before the first operation on August 28. Yet on August 29 Dr. Grant, in an application made on behalf of the petitioner to the Connecticut General Life Insurance Company for temporary disability benefits, answered "No" to the question "Is cause of disability in any way connected with patient's occupation?" He also crossed out the word "accident" from "description of accident or sickness" in the application. His only explanation for that was that he had made a mistake. On September 29 he filed another form with the same company in which he said "patient gives history of being struck in the right eye by an electric wire. * * *"

All of this is peculiar, but there is still the testimony of petitioner, supported by Bieksha, that the accident did happen. The deputy who saw and heard them believed them, and if they be believed, the accident has been proven. On a question such as this, the determination of the deputy is entitled to great weight. Furthermore, if petitioner intended to lie, the scissors-in-the-eye history would have been at least

as good a story as the blow from the wire. It is difficult to understand what he could have gained from concocting the wire injury if the scissors injury were true, or from changing from scissors to wire if both were false.

I find that there was an accident on July 30, 1950 as alleged by petitioner.

Petitioner produced Doctors Grant, Harris and Clark, who testified trauma may cause a detached retina. Though they all admitted the great majority of detachments of the retina result from causes other than trauma, they were of the opinion, based on the history of this case, that petitioner's detached retina was the result of the blow from the wire.

Respondent's Dr. Sherman and Dr. Dublin admitted that trauma may cause a detachment of the retina. Indeed, Dr. Dublin volunteered the information that medical literature states that traumatic retinal detachment happens more often and more easily than he had observed in his own practice. Both doctors were of the opinion that the blow here, if there were one, was not great enough in force, nor at a point, sufficient to cause a detachment.

Dr. Fissell, called by respondent, was not asked his opinion as to the cause of the detached retina. However, the question he had asked petitioner when he first examined him, mentioned above, shows that he considered the detachment might have been caused by trauma. It is interesting to note that he asked the question even though his examination showed no evidence that there had been any trauma.

One thing is obvious from the testimony of all of the doctors—there is no certainty as to what, in every case, causes detachment of the retina. Here we have a man who since 1942 worked for respondent as an electrician, who suddenly, within two weeks after July 30, 1950, suffered a detachment of the retina. Admittedly in most cases such a detachment is not traumatic, but we have already determined that on that date petitioner suffered a blow in the area of the eye. His doctors believe that caused the detachment. Shall that testimony be rejected in favor of a hypothesis of an idiopathic cause?

There is little or no direct testimony of the condition of this eye before the accident which can be related to the ensuing detachment. It is admitted that petitioner had a congenital eye condition known as a coloboma, but all of the doctors agreed that this condition has no causal relation to a detached retina. Petitioner admitted that his eyesight in both his eyes was poor prior to the accident. He had worn corrective glasses in 1934, but not since—why, does not appear. Presumably it was because the condition of his eyes was not helped by corrective glasses. Indeed, he testified that corrective glasses bothered him more than they helped him. He testified his right eye had been better than his left, before the accident, and in this he was corroborated to some extent by Dr. Clark. He testified his right eye was farsighted, the other nearsighted. However, the doctors found the left eye to be farsighted. There was no direct proof as to whether the right eye was nearsighted before the accident, nor as to the quantum of sight in the right eye. That eye was too far gone for such evaluation, after the accident.

It appeared that in 1933 or 1934 a doctor in Pennsylvania had examined petitioner's eyes and prescribed glasses. At the hearing, respondent said this witness would not testify without petitioner's consent, which petitioner then and there refused. Laying aside the fact that this examination was 17 years before the accident, it does not appear why respondent waited until the hearing to ask for the consent, nor why the witness's testimony could not be taken by deposition, nor what this witness would have testified to if he were called. Presumably the best he could have testified to for respondent would have been that defendant's right eye was nearsighted (and most detached retinas happen in the nearsighted) and that the vision therein was uncorrectably poor. But for 17 years thereafter petitioner had sufficient vision to be gainfully employed, the last eight of those years as an electrician for respondent, and his right eye was better than his left.

Here, too, the question is which doctors are to be believed, and therefore here, too, the opinion of the deputy who heard and saw the witnesses is entitled to persuasive weight with me.

I therefore find that petitioner's detached retina was caused by the accident of July 30, 1950.

■ Although respondent does not challenge the award of 7½% of permanent total disability for neurosis in its statement of the "questions involved," the respondent does challenge it in its brief. Suffice it to say that the petitioner's doctor testified that the petitioner had a neurosis caused by his injury, while the respondent's doctor testified there was no such neurosis. I accept the testimony of the petitioner's doctor, as did the deputy, and I accept the deputy's evaluation that the neurosis was 7½% of total.

■ Respondent's final point is that under *R. S.* 34:15–12(s) a petitioner may be awarded compensation for 100% loss of vision only if he lost all of the vision of an eye which, before the accident, was 100% perfect. For example, says respondent, if a petitioner had only 50% vision in his eye before an accident which made that eye blind, he is entitled to only 50% of total. If that be the case, says respondent, petitioner must prove the quantum of his pre-existent sight, and since petitioner here failed to offer such proof, he failed to sustain the burden of proof and there was no basis for any award for loss of vision, much less an award of 100%.

The question then is, does *subdivision (s)* of *R. S.* 34:15–12 mean the loss of petitioner's vision, whatever it was, or does it mean loss of 100% perfect vision? Respondent admits that *McCadden v. West End B. & L. Ass'n.*, 18 *N. J. Misc.* 395 (*Essex Cty. Ct.* 1940), *certiorari* denied 126 *N. J. L.* 1 (*Sup. Ct.* 1940), affirmed 127 *N. J. L.* 245 (*E. & A.* 1941), and *Vaccaro v. Walter Kidde & Co.*, 134 *N. J. L.* 491 (*Sup. Ct.* 1946), stand for the proposition that under the statute as it read before January 1, 1946, loss of an eye meant loss of petitioner's eye, in whatever condition it may have been. However, respondent argues forcefully that prior to January 1, 1946, the statute provided compensation "For the loss of an eye" and that because of the *McCadden* case the statute was changed and that now a petitioner can only recover for the amount of vision he actually loses.

The McCadden case did point out that the then statute spoke "in terms, not of the loss of vision, but of 'the loss of an eye,'" and Judge Hartshorne in his opinion in the *McCadden* case did say:

"Again the resulting hardship of imposing on the employer the same award, regardless of the state of vision, is a matter of policy, not of power. It is hence for the Legislature to correct by either specific reference to loss of vision, by amplification of the One Per Cent Fund Act, *N. J. S. A.* 34:15-94 *et seq.*, to cover partial permanent disabilities, or otherwise."

By *chapter* 74 of the *Laws of* 1945 the statute was amended by substituting the words "For the loss of vision of an eye," for the words, "for the loss of an eye," and by adding *subdivision* (*ss*) which reads as follows:

"ss. For the enucleation of an eye, sixty-six and two-thirds per cent [66 2/3%] of daily wages during twenty-five weeks, in addition to such compensation, if any, as may be allowable under subsection s."

Respondent argues that under well recognized principles of statutory construction, it must be assumed that *chapter* 74 of the *Laws of* 1945 was adopted to remedy the defect pointed out by Judge Hartshorne in the *McCadden* case, and that the Legislature meant that the statute bear the construction which respondent advances.

The *McCadden* case pointed out that the enucleation of a totally blind eye entitled a petitioner to the same compensation as he would have received for the enucleation of a good eye. That was corrected by *subdivision* (*ss*). Although the statute increased the compensation for loss of vision from 100 to 150 weeks, and gave an additional 25 weeks for enucleation, it placed the provision for enucleation in a separate *subdivision* (*ss*), so that for the enucleation of a totally blind eye the compensation now is only 25 weeks, while for the enucleation of an eye with vision the compensation is now 175 weeks.

Did the statute do more, as urged by respondent?

It is, of course, well settled that as to every other part of the body, the employer is held to have taken the employee as he found him, and as imperfect as he might be. To accept the construction advanced by the respondent would be to place injury to the eye in a category different from injuries to other defective parts of the body. Of course if such a construction be compelled by the language of the statute, it must be adopted, regardless of how inconsistent that construction may be with the language and the philosophy of the balance of the statute. However, I do not feel that the amendment of 1945 must be so construed.

An examination of *chapter* 74 of the *Laws of* 1945 shows that it amended numerous sections of the statute, in each case liberalizing those sections in favor of the employee. The "statement" annexed to the bill says that it "is intended principally to liberalize workmen's compensation benefits in accordance with the program outlined by Governor Edge in his first annual message to the legislature, January 9, 1945."

Though the cases in other jurisdictions are not squarely in point since they generally turn upon the wording of their respective statutes (see notes in 8 *A. L. R.* 1325; 24 *A. L. R.* 1467; 73 *A. L. R.* 708; 99 *A. L. R.* 1502; 142 *A. L. R.* 825), they do hold, as is said in 58 *Am. Jur.* 784, *paragraph* 290:

"According to most cases the right to compensation for the loss of an eye or of the vision thereof as the result of an injury is not affected by the fact that it was previously defective, although there is some authority to the contrary."

Good samples of the cases expressing the great weight of authority are *La Belle v. Britton Stone & Supply Corp.,* 247 *App. Div.* 843, 286 *N. Y. S.* 347 (*App. Div.* 1936) ; *Cunya v. Vance,* 100 *Ind. App.* 687, 197 *N. E.* 737 (*Ind. App. Ct.* 1935) ; *Downs v. Industrial Commission,* 109 *Colo.* 12, 121 *P. 2d* 489 (*Colo. Sup. Ct.* 1942) ; *Chicago Bridge & Iron Co. v. Industrial Commission,* 316 *Ill.* 622, 147 *N. E.* 375 (*Ill. Sup. Ct.* 1925) ; *Pyshnack v. Henry Forge & Tool,* 247 *App. Div.*

842, 286 *N. Y. S.* 412 (*App. Div.* 1936), affirmed (memo) 272 *N. Y.* 546, 4 *N. E.* 2d 729 (*Ct. App., N. Y.* 1936).

In my opinion *subdivision* (*s*) of *R. S.* 34:15–12 means loss of the petitioner's vision, and not loss of vision of a perfect eye. In the case at bar, the petitioner did have some useful vision of his right eye, and that useful vision he lost completely. I therefore agree with the deputy that petitioner was entitled to 100% loss of vision of his right eye.

The judgment of the bureau is in all respects affirmed.