43 N.J. Super. 139 (1956)
127 A.2d 918
RICHARD WALSH, PETITIONER-APPELLANT,
v.
LEO KOTLER, T/A AVON SHEET METAL WORKS, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided December 10, 1956.
*142 Mr. William F. Nies, attorney for petitioner-appellant (Mr. Graham Roskein, of counsel).
Mr. George E. Meredith, attorney for respondent-appellee.
GAULKIN, J.C.C.
Petitioner was awarded 20% of total permanent disability by the Workmen's Compensation Division for an "occupational disease"  a Dupuytrens Contracture. He appeals, alleging he should have been awarded total permanent disability. The respondent took no appeal, but now argues that petitioner failed to prove that he contracted any "occupational disease" for which respondent must compensate him under R.S. 34:15-31, and therefore even the 20% should be taken away. When this court questioned respondent's right to raise that question now, not having cross-appealed, petitioner conceded that respondent had that right. Without approving or disapproving that position, the case will be treated as if both sides had appealed in time. Cf. Kolonkiewicz v. W. Ames & Co., 23 N.J. Super. 265 (Cty. Ct. 1952).
When petitioner Walsh became disabled, on June 23, 1954, he was 65 years old, had been a roofer 40 years, and had never worked at anything else. For nine to ten years before that date he had been employed by respondent. As a roofer Walsh not only nailed or otherwise applied roofing materials to roofs, but prepared them (as in heating tar), and lifted or hoisted them to roofs by means of ropes, usually with pulleys. The materials were frequently heavy. He had done "that kind of work * * * close to forty years."
*143 The last two years of his employment, "not before," Walsh had "trouble" with his hands. He testified:
"Well, in 1952 * * * I went on the kettle, that was down below, melting asphalt and tar * * * Then, of course, I continually pulled up pails of hot stuff * * * We pulled it up, had to put the bucket on the hooks, then raise and pull it up. You pull up two pails, and you have two empty pails, and when you are letting them down, the rope slides through your hands * * * The same when you pull up anything heavy * * * They started to get sore from pulling this rope * * * They would get rough and red, your hands, they would get sore * * * in the last two or three months before I quit they would break open and would bleed. On the Flockhart job in Elizabeth, I went up on the roof and my left hand was bleeding very bad. At that time I think I was pulling insulation * * * We had to pull it from the ground to the roof."
Unable to continue, Walsh went home. This was on June 23, 1954. After a few days, he called upon his employer and told him he was going to stop work for a while "to rest the hands." He was then earning $120 per 35-hour week.
About a year earlier Walsh had noticed the third and fourth finger on each hand ("little finger and ring finger") drawing together. "They started to get a little tight, never stopped me from working * * * After June 23, 1954, they really started to get a little stiff."
The acute distress of the hands apparently subsided to such an extent that in September Walsh asked his employer if he could go back to work. However, at that time respondent had no work for him and said he would call him when he had. In December he did call Walsh, but by that time Walsh's fingers had stiffened so that respondent, when he saw Walsh's hands, refused to re-employ him.
It is agreed by both sides that petitioner has what is known as a "Dupuytren's Contracture," which causes a claw-like contraction of the fingers. The issues are: (a) is this a "compensable occupational disease" under R.S. 34:15-31, (b) if it is, was it contracted at a time and under circumstances which make respondent liable, and (c) what is the extent of the disability?
Respondent seems to argue first that Dupuytren's Contracture is not an "occupational disease" because it has *144 not been shown to be "due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment." However, we are not concerned with a definition of "occupational disease" which will satisfy a lexicographer. R.S. 34:15-31 has given "occupational disease" a special definition, and all we need determine is whether petitioner's disability meets that definition. That statute provides:
"For the purposes of this article, the phrase `compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment." (Emphasis added.)
No better answer to this argument could be given than the analysis of the statute made by Judge Francis in his article, "Recent Judicial Treatment of the Workmen's Compensation Act," 79 N.J.L.J. 337, 344 (Sept. 13, 1956). He said:
"The word `disease' was defined in the broad generic sense in Giambattista v. Thomas A. Edison, 32 N.J. Super. 103 (App. Div. 1954), as any departure from the state of health presenting marked symptoms.
Under this liberal statute, no longer is it required that the disease be one which is peculiar to the particular employment, such as lead poisoning * * * and the like. Now, recovery may be had for any disease  defined as any departure from the state of health producing marked symptoms  which is due to the exposure of the employee to a cause thereof arising out of and in the course of the employment. * * * Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495 (1952). * * *
Again, in Bondar v. Simmons Co., 23 N.J. Super. 109 (App. Div. 1952), affirmed o.b. 12 N.J. 361 (1953) * * * the appeal was predicated largely upon the ground that the condition was peculiar to the employee's susceptibility and not to the occupation. However, the award was affirmed, the court saying that one reason for the amendment of the Act was to overcome the previous decisional law that continuous minimal traumata did not constitute an accident and to provide for benefits in such cases on an occupational disease basis.
Then, in Giambattista already referred to, an award was granted where the employee was required to dip his hands repeatedly in *145 benzene. This aggravated a previous fungoid condition. The aggravation of a prior condition by employment connected exposures was said to be compensable.
And more recently a Dupuytrens Contracture of the hands, a disease in which the structures of the palm of the hand become involved in a scar-like contracture which produces ultimately a claw-like condition, was recognized as a basis for allowance. Factually, the employee was a truck driver who for 14 to 15 years, had been driving 15 ton tank-trailer trucks sometimes 400 to 500 miles a day, and who handled in the course of his work certain loading hoses weighing 60 to 70 pounds. There was medical proof that such multiple and varied pressures on his hands probably induced the contracture.
The proof showed also that some people have a susceptibility for the disease or are predisposed to it. This was said not to stand in the way of compensation. Duncan v. T.I. McCormack Trucking Co., unreported.
Under broadly worded occupational disease statutes such as our present one, the general rule seems to be that a man who brings to his work a special kind of proneness to a disability quite different from the ordinary run of men who do the work, suffers from a disease if the work added an ingredient of causation to precipitate a resulting disability * * *"
Respondent's next point is that the proof here does not support a finding that Walsh's disability is due to his "exposure to a cause thereof arising out of or in the course of his employment" with respondent. Respondent develops this point as follows:
(1) The greater weight of the testimony in this case shows that Dupuytrens Contracture is not caused, aggravated or accelerated by manual labor.
(2) That assuming Dupuytrens Contracture may be caused, aggravated or accelerated by some types of manual labor, Walsh's was not caused or so affected by his labor.
(3) That assuming Walsh's Dupuytrens Contracture was caused, aggravated or accelerated by his manual labor, that disease is one which, once it has progressed to a given point, will continue to progress regardless of whether the victim continues to work or not. Any work done after the disease reaches that point neither aggravates nor accelerates it. The testimony established that the disease was well advanced before Walsh entered respondent's employ. Walsh failed to *146 prove that the disease had not reached the "point of no return" before he entered respondent's employ. Hence he failed to prove that his disability or any part of it is due to his exposure "to a cause thereof arising out of or in the course of" his employment with respondent, as required by the statute.
Let us take these arguments in order.
I find from the testimony in this case that Dupuytrens Contracture is frequently caused, aggravated and accelerated by manual labor, even though there are cases in which those in sedentary occupations develop this disease. Although they may not be permitted to influence the decision in this case, which must be arrived at upon the basis of the testimony in this case, it is interesting to note that in several cases courts have found that Dupuytrens Contracture is an "occupational disease." Duncan v. T.I. McCormack Trucking Co., Inc., supra; Mesko v. Overman Cushion Tire Co., 16 N.J. Misc. 182 (W.C. Div. 1938); Soukup v. Friedman Marble & Slate Works, 255 App. Div. 249, 7 N.Y.S.2d 440 (App. Div. 1938); White v. Iroquois Gas Corp., 1 A.D.2d 705, 147 N.Y.S.2d 417 (App. Div. 1955); cf. Larson, Workmen's Compensation, sec. 39:10.
I find also from the testimony that Walsh's Dupuytrens Contracture was precipitated, and then aggravated and accelerated, by his work as a roofer.
The argument that gives me difficulty is "3" above.
One reason I have such difficulty is because my view of the essential testimony is obscured by the cloud of words that arises from the transcript. There are pages of testimony like this:
"Because the anatomy of the palmar fascia is variable, it normally is an extension of the tendons of the palmaris longus muscle which, however, is absent in 18% of the individuals. When the palmaris longus muscle is absent, there is an extension toward either the flexor carpi or flexor ulna radialis or ulnaris muscle together with extension into the palmar fascia; the palmar fascia is more or less rigid and the extensors dilate into the digits, because 20% of the individuals have an absence of extension over the fourth finger. The fascia extends across the thumb or what we call the thenar eminence *147 or ulna crest, over towards the hypothenar eminence or towards the little finger. There are interdigitations that extend down from this carpi fascia down to the bone, encapsulating blood vessels and nerves, and sometimes these interdigitations will extend across the metacarpal phalangeal joint into the base of the proximal phalanx."
There was no translation.
Had one Judge Maude's gift of expression, one would be tempted to say, as he recently said in the Old Bailey under similar circumstances, "Pray sir, spare yourself and have mercy on us." Such mercy, like the proverbial bread cast upon the waters, would pay handsome dividends to the litigants, for those cases in which petitioner's doctors say "Yes" and respondent's say "No" are difficult even when we understand the testimony. When we have to tunnel into the testimony with medical dictionaries the result may be as unjust as the process is painful.
The testimony of petitioner and his doctors established that only those predisposed to it develop Dupuytrens Contracture; that Walsh being so predisposed, his work may have induced it (according to petitioner's Dr. Keats) "within two or three months after he started" as a roofer. Petitioner's Dr. Graubard testified "once the condition is contracted it is progressive, regardless of any injury." As has been stated, petitioner worked for 30 years for other employers before he came to work for respondent. Therefore, argues respondent, if the process started 30 years before Walsh entered our employ, and once contracted continued in its progress regardless of the work done for respondent, petitioner is not entitled to recover from respondent.
An employee is entitled to recover compensation for an occupational disease from the last employer in whose employment his continued exposure brought on the disability, regardless of when and where and in whose employ the disease was first contracted. As the Court of Errors and Appeals said in Textileather Corp. v. Great American Indemnity Co., 108 N.J.L. 121, 123 (1931):
"It is a well-known fact that industrial diseases are gradual in development  the first and early steps are not always perceptible. *148 The rate of progress may vary. Sometimes a patient makes a complete recovery; sometimes it is only an apparent one. Sometimes the disease is quiescent and latent; sometimes the fatal course is swift. Medical science cannot always detect and describe the progress of disease. Employees exposed to occupational diseases frequently work for different employers. It is unthinkable that the Legislature should have contemplated that in such instances the recovery of compensation should be defeated. * * * The Legislature must have intended that compensation should be determined, subject to procedural limitations, when the disability or death occurred, and at no other time. Otherwise, the whole plan would prove ineffective. * * * It is well settled in England that an employee is entitled to recover compensation when he proves that the disablement occurred, within the statutory period for exposure to occupational disease in his last employment, irrespective of when and where the disease was first contracted. Blatchford v. Staddon & Founds (1927 Appeal Cases) 461."
To the same effect are Larson, supra, sec. 95:20; 104 A.L.R. 1210 note; Yurow v. Jersey Hat Corp., 131 N.J.L. 265 (Sup. Ct. 1944), affirmed 132 N.J.L. 180 (E. & A. 1944); Morin's case, 321 Mass. 310, 73 N.E.2d 467 (Mass. Sup. Jud. Ct. 1947); King v. St. Louis Steel Casting Co., 353 Mo. 400, 182 S.W.2d 560 (Mo. Sup. Ct. 1944). Cf. Commissioner of Taxation and Finance v. Nu-Art Advertising Co., 271 N.Y. 112, 2 N.E.2d 280, 104 A.L.R. 1209 (N.Y. Ct. App. 1936); Ogea v. W. Horace Williams, 165 So. 345 (La. Ct. App. 1936); Crawford v. Tampa Inter Ocean S.S. Co., 150 So. 875 (La. Ct. App. 1933).
However, the last exposure must have a causal relation to the disability. Larson, supra, sec. 95:20 et seq.; Domscheit v. Natural Products Refining Co., 14 N.J. Misc. 403 (W.C. Div. 1936); Calabria v. Liberty Mutual Ins. Co., 4 N.J. 64 (1950); Hayes v. Ajax Rubber Co., 202 Wis. 218, 231 N.W. 584 (Wis. Sup. Ct. 1930); Zurich General Accident & Liability Insurance Co. v. Industrial Accident Commission, 203 Wis. 135, 233 N.W. 772 (Wis. Sup. Ct. 1930); Haglund v. Bayer Co., 243 App. Div. 840, 278 N.Y.S. 451 (App. Div. 1935); Bonner v. Industrial Accident Commission, 140 P.2d 1000 (Cal. D.C. App. 1943); Sylvia's case, 313 Mass. 313, 47 N.E.2d 293 (Mass. *149 Sup. Jud. Ct. 1943); Lambert's case, 325 Mass. 516, 91 N.E.2d 228 (Mass. Sup. Jud. Ct. 1950).
In Calabria v. Liberty Mutual Insurance Co., supra, Calabria's disability consisted of an aperture in his nasal septum caused by chrome poisoning. He had been employed by one employer since 1942. That employer was insured by Liberty Mutual until November 28, 1946, by Hartford Accident from that date to January 1947, and thereafter by Employer's Mutual. Calabria notified the employer of his claim in 1946, but continued in the employ of the same employer, and under the same exposure, until the hearing in 1948. The Bureau "found as a fact that the claimant's disability * * * occurred before November 28, 1946, that it became static while the Liberty Mutual was the carrier and that there had been little or no change in the disability down to the date of the hearing in January of 1948." The Bureau and the County Court therefore found Liberty Mutual alone liable. The Supreme Court affirmed, saying (4 N.J., at page 70):
"The disability arose and came to its peak during the coverage of that company; notwithstanding the continued exposure into the terms of other insurers the disability remained static with little or no change during that extended period. If hereafter application be made for additional compensation upon the ground of increased disability, there is nothing in the present determination to prevent an inquiry into the causes of such increase, particularly with respect to subsequent exposure as a causative factor, and a fixing of liability accordingly. This judgment is not res judicata against Liberty Mutual to the extent of making it responsible for increases in the disability due, not to the natural progress of the existing disability, but to results of subsequent exposure to chrome poisoning."
The question then is, does the testimony here sustain petitioner's burden of proving that his disability is due to his exposure "to a cause thereof arising out of and in the course of his employment" with respondent.
Here we run into another old reliable source of confusion, the blunderbuss hypothetical question. An analysis of the hypothetical questions asked ad libitum of petitioner's doctors, and their answers, leaves doubt that either of them were *150 asked whether petitioner's ten years with respondent precipitated, aggravated or accelerated petitioner's disease. It seems to me that the sum and substance of their testimony is that petitioner became disabled in June 1954 by Dupuytrens Contracture which had been precipitated and had matured during his 40 years work as a roofer, but what part, if any, the last 10 years played in producing his ultimate disability is not isolated in the testimony. Is that sufficient?
It seems to me that after this proof was adduced, the burden passed to the respondent to go forward with proof that the ten years of exposure in respondent's employ added nothing to the severity of the disease or its tempo. In Koval v. Natural Products Refining Co., 25 N.J. Misc. 489 (Sup. Ct. 1947), petitioner developed chrome poisoning which "had its inception in December of 1945, but there is no proof that it instantly attained its full size." Petitioner quit in January 1946 "because he could not stand it any more." The employer contended he was to be compensated on the 1945 rather than the 1946 schedule. Although "respondent's expert testified that whatever chrome would do * * * it would do early and that is where it ends," Chief Justice Case held that was not enough. He clearly put the burden of proof upon defendant when he said, 25 N.J. Misc., at page 491:
"Lacking proof as to when the progress of the disease was arrested and the condition became chronic, I consider that the disability, within the meaning of the statute, became established when prosecutor found himself unable longer to endure the employment and, by quitting, ended the exposure." (Emphasis added.)
Concededly, Walsh worked for respondent with no difficulty whatever for about eight years, and then with increasing difficulty for two more years, until he became disabled in June 1954. Since that date he has been completely unable to work. One fourth of his entire working life  the last fourth  had been in respondent's employ. Certainly it is reasonable to infer that at least some of those years, doing the type of work which initiated and carried forward his *151 disease, were a competent contributing cause of the disability. See also Haglund v. Bayer Co., supra.
It is sufficient for the determination of this case to say that the burden of going forward to rebut that inference is upon respondent. However, it may be that even the ultimate burden of proof on that issue is on respondent, as it is in all cases in which the employer contends that an apparently work-caused disability is due to causes for which the employer is not legally responsible. Spindler v. Universal Chain Corp., 11 N.J. 34 (1952); Lilly v. Todd, 15 N.J. Super. 1 (App. Div. 1951); Atchison v. Colgate & Co., 3 N.J. Misc. 451 (Sup. Ct. 1925), affirmed 102 N.J.L. 425 (E. & A. 1925); Simon v. R.H.H. Steel Laundry, Inc., 25 N.J. Super. 50 (Cty. Ct. 1953), affirmed 26 N.J. Super. 598 (App. Div. 1953); Murowisky v. Pyrene Mfg. Co., 17 N.J. Misc. 390 (W.C. Bur. 1939); Krov v. Centaur Constr. Corp., 18 N.J. Misc. 593 (W.C. Bur. 1940).
In my judgment, respondent did not rebut that inference. It is true that respondent's experts denied that Walsh's work aggravated or accelerated the disease, but their testimony was that manual labor never precipitates, aggravates or accelerates this disease, and my conclusion is to the contrary. They testified that such labor might exacerbate the condition, but that exacerbation would cease when the work stopped, and respondent points to the fact that after Walsh did stop in June his hands became so much better that in September he was able to offer to come back to work, yet between September and December, even though he was still home and not working, Walsh's fingers stiffened to a degree that made it impossible for him to work. However, respondent's experts admitted they do not know what causes this disease, or accelerates it.
For the foregoing reasons it is my conclusion that Walsh's disability is due to his exposure arising out of and in the course of his employment with respondent.
We turn then to the question of disability.
The deputy awarded 20% of total permanent  less even than the respondent's own doctor estimated the disability to be
*152 The deputy gave his reasons as follows:
"* * * petitioner * * * does have a permanent disability  which I find is reasonably chargeable to the respondent, bearing in mind his predisposition to the condition and his refusal to submit to surgery, this permanent disability chargeable to the respondent being twenty per cent * * * The overall disability is considerably higher, the excess * * * not being chargeable to the respondent, nor attributable to the employment." (Emphasis added.)
These reasons do not appear to be valid. Walsh's "predisposition to the condition" does not justify apportioning his disability at so much for the predisposition and so much for the effect of his work for respondent. His predisposition did not disable him; his work for respondent did. Under those circumstances, the employer is liable for all of the end result. Giambattista v. Edison, supra; Bondar v. Simmons Co., supra; Davenport v. Alvord Hotel, 21 N.J. Super. 493 (Cty. Ct. 1951); Cooke v. Cooke & Cole Silk Co., Inc., 19 N.J. Misc. 581 (W.C. Div. 1941); Burrock v. Tung Sol Lamp Works, Inc., 30 N.J. Super. 456, 465 (Cty. Ct. 1954); Masses v. Central Foundry Co., 131 N.J.L. 41 (Sup. Ct. 1943).
Nor is there any proof in the record of any "refusal to submit to surgery" that justifies cutting down petitioner's award.
R.S. 34:15-23 reads as follows:
"Whenever it shall appear that an employer is being prejudiced by virtue of the refusal of an injured employee to accept proffered medical and surgical treatment * * * the employer is hereby authorized to file a petition with the workmen's compensation bureau, which is hereby empowered to order proper medical and surgical treatment at the expense of the employer. In the event of refusal or neglect by the employee to comply with this order the bureau shall make such modification in the award contained in the schedule as the evidence produced shall justify." (Emphasis added.)
No such petition was filed by the employer, and even though the petitioner's claim was filed in November 1954, no such issue was raised by the employer prior to the hearing in March 1956. The employer denied all liability at all times *153  it still does  and never offered surgery until the morning of the hearing; and even of that alleged offer there is no competent proof in the record. The deputy said in his conclusions that such an offer had been made during a conference in his chambers, but the details of that conference were not given by the deputy, nor are they to be found anywhere in the record. Petitioner on the other hand says  admittedly also "dehors the record"  that no "offer" was made in chambers. Petitioner asserts that in that conference respondent's attorney did suggest surgery, but insisted that it be "without prejudice  i.e., without admitting liability for the occupational disease, or responsibility in case any untoward surgical complication might result."
Without passing upon the propriety of a conference in chambers (cf. R.R. 1:28-6) what happened at such a conference must be ignored by the deputy as well as by this court unless a statement of what transpired is made on the record which is then and there accepted by the litigants as correct. In this case, therefore, the conference mentioned by the deputy must be ignored. Kalson v. Star Electric Motor Co., 15 N.J. Super. 565 (Cty. Ct. 1951), affirmed 21 N.J. Super. 15 (App. Div. 1952).
After this conference, at the insistence of the deputy, over petitioner's objection, the doctors were questioned about the feasibility of surgery. The doctors expressed varying views. Like the conference in chambers, this question was explored by the deputy in the utmost good faith, with a desire to benefit the employee as well as to be fair to the employer, but it was immaterial under the issues before the deputy, and should not have been permitted. Robinson v. Jackson, 116 N.J.L. 476 (E. & A. 1936).
What then is the extent of petitioner's disability? The deputy described it objectively as follows:
"The petitioner is unable to approximate the thumb and the fingers. There is very little flexion of the third and fourth fingers of either hand, the first two fingers he appears to be able to do it. Well, they are naturally affected because of involvement of the third and fourth fingers."
*154 Petitioner's Dr. Graubard testified:
"He has a large fibrous mass in the palms of both hands, more in the vicinity of the third and fourth fingers than of the first and second, with extension of the fibrous portion into the proximal portion of the proximal phalanges of the third and fourth fingers, with very definite flexion contraction with inability to extend the metacarpal phalangeal joints of the third and fourth fingers beyond a 90 degree angle, associated with the restriction of dorsi flexion or extension of the wrists. The skin of the palm is attached to the fibrous tissue below, and there is some evidence of a puckering."
All of the doctors, including those who testified for respondent, agreed that Walsh could no longer work as a roofer. Dr. Graubard testified:
"From the point of view of the type of work he was doing prior to this onset in 1954, namely, that of a roofer, I would say his hands have a disability of 100% functionally. Based on his ability to work, other than that of a roofer, not requiring pulling, hammering and so forth, it is my opinion that he has functionally in each hand equivalent to 80% loss of function."
Petitioner's Dr. Keats testified:
"Q. Doctor, can you tell us, in your opinion to what extent his condition has affected the efficiency of the use of his hands in the ordinary pursuits of life?
A. Well, if you eliminate the factor of his being unable to return to his former occupation, I would say that each hand per se would be suffering a loss of function of approximately 66 2/3% of his function."
Petitioner contends that since he can no longer work as a roofer he should be awarded 100% of total. However, "the test is not the immediate impairment of earning power, it is rather a loss ensuing from personal injury which detracts from the former efficiency of the workman's body or its members in the ordinary pursuits of life." Cooper v. Cities Service, 137 N.J.L. 181, 184 (E. & A. 1948). Cf. Rodriguez v. Michael A. Scatuorchio, 42 N.J. Super. 341 (App. Div. 1956). Respondent on the other hand argues that "the problem is essentially one of addition"  that all that needs *155 to be done here is to add the allowances provided in R.S. 34:15-12 for "g. for the loss of a third finger" and "h. for the loss of a fourth finger" and multiply by two. As Judge Goldmann said in Rodriguez v. Michael A. Scatuorchio, supra, that argument "comes more than 20 years too late in the development of our compensation law." In addition, it ignores the fact that the disability has affected the palms, the wrists, and the other fingers as well. R.S. 34:15-12(v) provides that "the loss of both hands * * * shall constitute total and permanent disability * * *."
However, the fact remains that the wrists, the hands, and the fingers other than the third and fourth fingers are to some degree usable, and there seems to be no other involvement or effect, neurological or otherwise. The only testimony of any effort to obtain employment other than that of a roofer is one interview at the State Employment Office regarding a job as watchman. Petitioner's attorney interprets that testimony to mean that Walsh was told he could get no such job unless he could handle a gun. I do not so interpret it.
Upon all of the facts in this case, it is my determination that petitioner has suffered a 66 2/3% of total permanent disability.
A judgment in accordance with the foregoing determination may be submitted.