MORRIS SILBERMAN, PETITIONER-RESPONDENT, v. NA-
TIONAL EGG AND PRODUCT CO. AND JAMESTOWN
MUTUAL INSURANCE CO., DEFENDANTS-RESPOND-
ENTS.

MORRIS SILBERMAN, PETITIONER-RESPONDENT, v. NA-
TIONAL EGG AND PRODUCT CO. AND MANUFACTUR-
ERS CASUALTY INSURANCE COMPANY, DEFENDANTS-
PROSECUTORS.

Submitted October 5, 1943—Decided February 11, 1944.

Before Justices HEHER and PERSKIE.

For the prosecutor Manufacturers Casualty Insurance Co.,
*Foley & Francis* (*Gerald T. Foley,* of counsel).

For the respondent Jamestown Mutual Insurance Co.,
*Frank P. Zimmer.*

For the petitioner-respondent, *David Roskein* (*Harry
Cohn,* of counsel).

The opinion of the court was delivered by

HEHER, J. The question to be resolved here is which of
the two defendant insurance carriers is liable for the com-
pensation concededly payable to the petitioner, Silberman,
under *R. S.* 34:15-7, *et seq.,* for disability ensuing from
injuries sustained while pursuing his employment with
defendant National Egg & Product Co.

The Compensation Bureau found that petitioner is perma-
nently disabled to the extent of 35% of total, and that 10%

of this is attributable to a back sprain he suffered on August 13th, 1940, while lifting a heavy object, and 25% to an aggravation of the injury by a further sprain sustained in the same manner on the following September 9th. The Manufacturers Casualty Insurance Company was the insurance carrier when the original accident occurred, and the Jamestown Mutual Insurance Company was the carrier at the time of the alleged second mishap. The Essex Court of Common Pleas concluded that "the second episode was not a separate accident, but a recurrence of the condition produced by the first," and that "the accident of August 13th, 1940, was the inducing cause of the disability from which * * * the petitioner suffers," and therefore the insurance carrier at the time of the original injury was solely responsible for the compensation payable to the employee. We do not concur in this finding.

While there is medical opinion that the entire disability is referable to it, it is not fairly disputable that there was a second industrial mishap which substantially aggravated the consequences of the first injury; and this, in itself, constitutes an injury by accident within the statutory sense. It is also reasonably inferable that the area of the second injury was much more extensive than that of the first.

The employee testified as follows respecting the earlier occurrence: "I was taking a case of ham down from a pile and putting it on a flat truck, and as I bent up I felt a snap in the right lower back, and couldn't straighten up." Dr. Lowenstein "taped" his back about two hours later, and treated him five or six times until August 26th or 27th. Meanwhile, he continued his work, with the aid of a helper on "heavy days" during the first two weeks, although he "had pain in the lower right back practically at all times." He explained that he discontinued his visits to the physician because he "had no time to stop there;" but it is clear that there was a substantial improvement in his physical condition. As to the second mishap, he said: "After that, on September 9th, I lifted a can of cream into a customer's store, around 5:30 o'clock in the afternoon, and I felt another snap in the same part of the back, the right lower back." The

lifted object weighed about 107 pounds. Immediately prior to this occurrence, his back "was weaker," compared "with the way it felt months previous," but he "hadn't any definitely sharp pains." Thereafter, the pain "seemed sharper." He could not finish his work; and the next morning he was unable to leave his bed. Dr. Lowenstein again "taped" his back. The witness was incapacitated for a week and a half, and thereafter he was able only to "ride with the route manager" until sometime in October, when he took light work elsewhere. This he could do but intermittently. He did not respond to the ordinary medical treatment; and in April, 1941, he submitted to an operation designed to effect a spinal fusion. It was found that there were a subluxation of the articular surface of the fourth and fifth lumbar vertebrae and a right sacro-iliac sprain, with incidental involvements.

Dr. Lowenstein, the only physician who treated the employee immediately after both mishaps, testified that the first accident resulted only in a strain of back muscles, with no permanent injury. We do not think this witness is discredited. He offered a plausible explanation of what seemed to be a discrepancy between his testimony and the content of a report he made to the respondent insurance carrier. The deputy commissioner concluded that the seeming contradiction was due to mere inadvertency; and he had the advantage of personal observation of the witness. The Common Pleas Judge was influenced largely by evidence adduced from Dr. Miller, who was the employee's family physician. He was first consulted on December 6th, 1940; and he treated petitioner until December 15th ensuing. He diagnosed the condition as a sacro-iliac separation and sciatic nerve irritation; and he concluded the separation required an operation. As to the origin of the disability, he said: "I would be prone to feel that the man has had an injury as his history gives, the first time on August 13th, and if it recurs again a month or two later, that the original injury is the cause of the whole series of mishaps after that." On cross-examination, the witness said that Silberman did not tell him that he was stricken on the second occasion while lifting a heavy object. He said: "The only history I have was about 100 pounds of ham, and

that since then he had frequent recurrence, every once in a while it would kick up on him." The witness then qualified this statement by admitting the patient did inform him of "another occurrence * * * while he was lifting something in the course of his work." He continued: "He told me he lifted heavy packages. I didn't go into the question of what it was." In response to a hypothetical question, based upon the evidence elicited from the employee, as to whether he could say the condition he found "was not entirely the result of the second occurrence," he said: "I wouldn't know that, but I feel this way: Anyone who has had a back injury certainly isn't going to feel that you can have the same back injury time after time in the same place and not feel that the original injury was not the cause." As to the effect of the "second accident" on the pre-existing condition, he declared: "I felt that he might have cleared up in the first condition, and been left with a remnant of a weak back there, and it took a second strain, or possibly three or four, to produce that which would require surgical intervention."

Thus, this medical witness had in view the original accident as the primary cause of the back weakness; he did not regard the later accidental aggravation of the pre-existing injury as a "second accident." But the legal consequences of the aggravation of an old injury are not, of course, controlled by medical opinion. These observations are likewise applicable to a theory voiced by a medical expert called to the witness stand by the respondent insurance carrier. If it be considered as indicative of the belief that the second happening did not augment the pre-existing incapacity due to the first injury, it is purely speculative and at variance with the established facts. The disability consequent upon the first accident was minor compared with that which followed the second strain. We conclude that the second occurrence was a compensable accident within the purview of the statute, and that the deputy commissioner fairly admeasured the *quantum* of the disability flowing therefrom.

It results that the judgment of the Court of Common Pleas is reversed, and the judgment of the Compensation Bureau affirmed, with costs.