EMPLOYER'S CASUALTY COMPANY *v.* UNITED STATES FIDELITY & GUARANTY COMPANY.

4-8616                                    214 S. W. 2d 774

Opinion delivered November 8, 1948.

*Daily & Woods,* for appellant.

*Paul E. Gutensohn* and *Warner & Warner,* for appellee.

Holt, J.  This litigation presents a contest between two insurance carriers under the Workmen's Compensation Act 319 of 1939, as amended.  No question is raised as to the right of the claimant to the award made by the Commission.  The question for our determination is the respective liabilities of these two insurance carriers to pay the award, it being appellant's contention that the full liability should fall upon appellee, and appellee on cross-appeal argues that the full liability should fall upon appellant.

The Commission found that the liability for payment of its award to the claimant should be borne equally by these two insurance carriers, and so ordered.  On appeal by appellant only, the Circuit Court affirmed the action of the Commission.  On direct appeal, appellant, as indicated, argues that the full liability for payment of the award should fall upon appellee, and on the contrary, by cross-appeal, appellee argues that the full liability should fall upon appellant, and in any event, appellant should

be held liable for one-half of the award as found by the Commission and affirmed by the Circuit Court.

The question appears to be one of first impression before this court.

As we view the record, the primary and decisive question is one of fact. It is undisputed that appellee, U. S. F. & G. Co., was the compensation insurer from prior to December 1, 1946, until February 1, 1947; that on the latter date, appellant took over the risk, thus relieving appellee.

Only two witnesses testified before the Commission, Dr. Fred Krock and the claimant, Clyde Prescott.

The summation of facts as made by the Commission appears fair and complete and we adopt it here.

"The claimant, Clyde Prescott, entered the employ of this respondent in August, 1945. His average weekly wage was $39.15.

"He testified on August 13, 1947, that on or about December 19, 1946, he was pushing wheelbarrows of ore, weighing 7 or 8 hundred pounds, when he felt a strain, or catch, in his left hip and his back felt numb and the pain went down his leg to the end of his toes. That he told his yard foreman, Perry Kuykendall, that he had 'throwed a catch' in his hip. He continued to work, however, until on December 24 the pain was such that he got an order to go to Dr. Krock.

"Dr. Krock examined him and told him he had arthritis and there was nothing he could do for him except to put a light on his hip. He returned to work the day after Christmas and continued to work until February 14, 1947. He testified that he was 'in misery' all the time he worked and went to Dr. Scott for treatment during this period. When he was forced to lay off on February 14, he asked for another order to go to the doctor, but this was not done because Dr. Krock had reported that he had arthritis. He then went to Oklahoma at his mother's request, and saw Dr. Rutherford and was sent by him to the McBride Clinic in Oklahoma City, where

he was operated on for herniated disc in the low back by Dr. Margo on April 16, 1947. He is still disabled and unable to work. On cross-examination he testified that when he saw Dr. Krock on December 24, 1946, he does not remember whether he complained to Dr. Krock of his back but only of his hip; that after he had seen Dr. Krock the pain got progressively worse until he had to quit on February 14, 1947; that during that period he kept wheeling heavy loads of ore.

"He further testified that prior to the occurrence on about December 19, 1946, he had never had any trouble like that, that he considered himself a strong, healthy man and had done heavy work.

"On January 7, 1947, the claimant gave a statement to a representative of the U. S. Fidelity & Guaranty Company who was the insurer of the respondent until February 1, 1947. Asked exactly when he first noticed his back condition the claimant said he could not tell exactly, that it gradually came on, that it was his left hip, it wasn't his back, that it got worse and he thought it was a sprain and asked them to send him to a doctor; that about December 1, 1946, he was unloading a car and caught his heel and his left leg doubled up under him; that he had a pain in the calf of his leg for two or three days and then didn't bother him any more; that the pain wasn't like the pain following the occurrence on or about December 19, 1946; that the pain in his hip had come on gradually; that he first noticed it a few days before they sent him to the doctor on December 24, 1946, two or three days before he was unloading ore when it started to hurt. On January 7, 1947, he stated that his hip still hurt, no complaint was made of his back, he did state that pains radiated down his left leg. He had been told by Dr. Krock that it was arthritis and had not been informed otherwise. He complained at that time that unloading ore seemed to make his condition worse, caused it to pain more.

"Dr. Fred Krock testified before the Commissioner on August 13, 1947, that he saw the claimant on December 24, 1946; that he was given the history of gradual

onset of pain in the left hip on December 19 or 20; that the claimant thought he had sprained his left hip. He did not at that time complain of injury or numbness of his back. X-rays were made that showed no evidence of a traumatic bone injury, but did show a narrowing between the fourth and fifth lumbar interspaces. It was his opinion at the time that it was an arthritic condition. It was also his opinion that the narrowing between the fourth and fifth lumbar interspace had occurred a matter of months prior to December 19, 1946. At the time of his examination the usual symptoms of a herniated disc were not present. He did not have the history of pain radiating down the leg along the sciatic nerve; there was a negative La Sage test, no atrophy or decrease in the knee or ankle jerks. For this reason he made a diagnosis of arthritis.

"A herniated disc may develop insiduously over a long period of time or may develop as a result of injury. The ligaments which hold the disc in place tear out and allow the gristle between the bones to protrude and press on the nerve roots, as the protrusion increases the pain spreads along the sciatic nerve, it can be progressive. This could have been caused by strain. If he had a strain on December 19, it must be admitted, in the light of later developments, that this was producing the symptoms. From the X-ray, it was protruding before December 19, as it takes months to take place. This strain of December 19 could have aggravated it by pushing more of the disc out. Continuing to work to February 14 could have caused the protrusion to become more pronounced. Heavy lifting over a long period of time will predispose a herniated disc. It could possibly become progressively worse if he had been at rest after the beginning of symptoms.

"The report of Dr. Krock made December 24, 1946, was admitted in evidence. This report is in accordance with his testimony.

"The report of the McBride Clinic, dated May 7, 1947, shows that they saw the claimant first on April 9, 1947. At that time he was complaining of considerable

pain in the lower part of his back, left hip and leg. He gave the history of having had this condition for a period of time with a probable history of an injury back to last November.

"Examination and X-ray revealed that he had a herniated disc in the low part of the back. Surgery was recommended and this was carried out on April 16, 1947, at which time there was found a herniated disc, left side lumbosacral area. A fusion was done to the lower spine. His recovery has been satisfactory, but it will be several months before he will be able to resume work."

Upon the above statement, the Commission makes the following findings of fact:

"1. That prior to December 19, 1946, the claimant had a preëxisting condition which predisposed him to herniation of an intervertebral disc.

"2. That the claimant received an injury that arose out of and in the course of his employment on December 19, 1946, aggravating this preëxisting condition.

"3. That from December 19, 1946, to February 14, 1947, the claimant continued to receive successive injuries, that arose out of and in the course of his employment, progressively aggravating his preëxisting condition into disability on February 14, 1947."

We quote the following testimony of the claimant, Prescott, relating to events following his return to work after Dr. Krock's examination. His condition "gradually got worse, it hurt a little, but I could still work. It didn't get to where I couldn't work. . . . I ruptured it worse. . . . As I continued to work it got worse. It continued to gradually get worse because I was lifting these heavy loads. From the day I got hurt until I quit . . . it was a strain when I lifted the wheelbarrow. . . . Q. And you kept working until February? A. Yes, sir, I was in misery all the time, but I had to live."

Appellant in the concluding paragraph of its brief sums up its position: "It is submitted that the third finding of fact of the Commission is wholly unsupported by any evidence in the record, as is likewise the portion

of the award imposing one-half of the liability for compensation upon the appellant.''

In determining the sufficiency of the evidence to support awards in Workmen Compensation cases, we have repeatedly held that ''the findings of the Commission on factual questions are as binding on the courts as are the verdicts of juries. . . . The Circuit Court on appeal from the Commission, and this court, on appeal from the Circuit Court, must weigh the testimony in the strongest light in favor of the Commission's finding.'' *Andrew* v. *Gross* v. *Janes Tie Co.*, 211 Ark. 999, 204 S. W. 2d 783.

''Circumstantial evidence is sufficient to support an award of the Commission, . . . In determining the sufficiency of evidence, doubts should be resolved in favor of claimant, and the evidence should be reasonably and liberally construed in his favor.''. *Simmons National Bank* v. *Brown,* 210 Ark. 311, 195 S. W. 2d 539.

Guided by these rules, we think there is substantial evidence to sustain the judgment of the Circuit Court affirming the Commission's finding that from December 19th to February 14th the claimant continued to receive successive injuries by traumatic strains, that arose out of and in the course of his employment, which progressively aggravated his preëxisting condition into the disability February 14th, when he ceased to work.

There is substantial evidence that the claimant, after he received the injury December 19th as above outlined, continued in the heavy lifting in which he was engaged at the time, on and after February 1st when appellant's insurance coverage began, and that this heavy lifting after the December injury up to February 14th, continuously aggravated his condition and that he received injury while appellant was the insurer leading up to his disability February 14th.

In the circumstances here, while this court as above noted appears not to have specifically passed upon the question dividing liability, and while we think the evidence, when liberally construed, was sufficient to have fastened liability on either of these insurance carriers for the full amount, we are unable to say that an equal

division of this liability, for a single disability, on the facts presented, was not within the Commission's power and we hold that the action of the trial court in affirming the Commission's order is supported by reason and authority.

In 71 C. J., § 1353, p. 1411, the rule is stated: "Compensation for a single disability resulting from separate accidents occurring under different employers should be equally apportioned between the insurers for the different employers."

Here, as indicated, there is substantial evidence that Prescott suffered a compensable injury growing out of a series of separate traumas by strain and heavy lifting from December 19, 1946, to February 14, 1947, all of which aggravated a preëxisting condition into the disability which occurred February 14, 1947.

Accordingly, on the whole case, finding no error, the judgment is affirmed.

GRIFFIN SMITH, Chief Justice, dissenting. If I could agree with the majority that "the primary and decisive question is one of fact," a dissent would not be required. The opinion expressly says it is "undisputed" that U. S. F. & G. "was the insurer from prior to December 1, 1946, until February 1, 1947; that on the latter date (Employer's Casualty) took over the risk, thus relieving U. S. F. & G."

Whether a judgment is supported by substantial evidence is a matter of law. In determining there was or was not sufficient evidence in a considered case Courts are not relegated to miscellaneous statements lifted from the context.

From the so-called factual point of view, it was conceded in oral argument that Dr. Krock made an error when he examined the claimant December 24. This was due to the angle at which X-ray pictures were taken. It does not in any sense reflect upon the high professional standing of the physician, whose status as an extraordinarily competent diagnostician is firmly fixed,

The term "disability" as used in the Compensation Act, appears in insurance policies, many of which have been before the Courts. We have said it was not error to charge the jury that a plaintiff was totally disabled if the proof showed him to be unable to perform, "in the usual and customary manner, all of the material duties of his profession." *Pacific Mutual Life Insurance Company* v. *Riffle,* 202 Ark. 94, 149 S. W. 2d 57.

In the case before us Prescott began working in August 1925 and was injured December 19, 1946, when U. S. F. & G. was the exclusive insurer. The undisputed testimony is that during the latter part of December and through January, Prescott (after having reported the injury) continued to work until February 14, "but was in misery all the time," and while enduring great pain remained on duty "because I had to live."

Except where *total disability,* as expressed in a contract or statute, imperatively requires a construction placing the claimant on a stretcher, in a hospital or wheelchair, or immobilizing him in bed, Courts generally do not say that because a person of remarkable courage and fortitude remained at work while others similarly afflicted would yield, he must be classified as fit for service.