50 N.J. Super. 468 (1958)
142 A.2d 655
HAROLD QUINN, PETITIONER-RESPONDENT,
v.
AUTOMATIC SPRINKLER COMPANY, RESPONDENT, AND LONDON & LANCASHIRE INDEMNITY COMPANY, RESPONDENT-APPELLANT, AND TRAVELERS INSURANCE COMPANY, RESPONDENT-CROSS-APPELLANT, AND FIREMAN'S FUND INDEMNITY COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 3, 1958.
Decided June 13, 1958.
*470 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Francis H. Pykon argued the cause for appellant Fireman's Fund Indemnity Company (Mr. Henry M. Grosman, attorney).
Mr. Arthur F. Mead argued the cause for appellant London & Lancashire Indemnity Company (Messrs. Mead, Gleeson, Hansen & Pantages, attorneys).
Mr. John W. O'Brien argued the cause for cross-appellant Travelers Insurance Company (Messrs. O'Brien, Brett & O'Brien, attorneys).
Mr. William J. Straub argued the cause for respondent Harold Quinn (Mr. Joseph P. Dunn, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Fireman's Fund Indemnity Company (Fireman's) and London & Lancashire Indemnity Company (London & Lancashire) appeal from a County Court judgment sustaining an award by the Workmen's Compensation Division in petitioner's favor, but modifying the allocation of liability for the award and for the cost *471 of surgical intervention to correct the condition existing in petitioner's left shoulder. Travelers Insurance Company (Travelers) cross-appeals.
Petitioner is admittedly suffering from a compensable disability arising out of and in the course of his employment by his respondent employer, Automatic Sprinkler Company. The Division's determination of the amount of partial permanent disability is not in dispute. The only question requiring decision on this appeal involves the allocation of liability among and between the three insurance companies, each of whom, successively, happened to be the insurance carrier at the time of one of petitioner's three accidents while in the employ of Automatic Sprinkler. Petitioner does not appeal, nor does the employer. However, petitioner filed a brief seeking immediate payment of the award regardless of the manner of apportionment. To this he was entitled. As was said in Cunliffe v. Deslauriers Column Mould Co., 5 N.J. Misc. 1037, 1039, 139 A. 411 (Sup. Ct. 1927), "the employee has only to look to the employer for compensation. His case ought not be prejudiced by a change of insurance companies." We are informed that he is now being paid the award, so that no further reference need be made to his request.

I.
On June 30, 1952 petitioner was drilling a hole in a ceiling, the drill chipped, and a piece of steel lodged in his left mid-bicep area. Fireman's was on the risk at the time. Petitioner was treated every day for about 2 1/2 weeks by a Dr. De Luca, who would fluoroscope him for 20 to 30 minutes at a time until the metal was located and removed. Following this exposure to fluoroscopy the skin in back of petitioner's shoulder became red and began to rot away. Although the condition ostensibly cleared up, it left scars.
The second accident occurred on September 16, 1953 when petitioner's left anterior forearm was pierced by a steel chip slightly below the elbow. He was again fluoroscoped by Dr. *472 De Luca for three days, each time for 20 to 30 minutes, and the metal located and removed. A condition of the skin behind the elbow, similar to that which occurred after the fluoroscopy attendant upon the first accident, followed the second exposure, with resultant scars. London & Lancashire was the insurer on this risk.
Petitioner filed separate claim petitions seeking compensation for these two accidents. The petitions were consolidated for trial and on March 25, 1955 the Workmen's Compensation Division awarded 5% of permanent total disability of the left arm for the first accident and 7 1/2% of permanent total of the statutory left hand (plus 2/7ths of a week temporary benefits) for the second accident. There was no appeal.
The third accident occurred April 13, 1956, when the insurer was Travelers. Petitioner was screwing two pieces of pipe together when his chain tongs slipped and his left elbow struck a steel beam. The point of impact was about an inch below the elbow on the anterior side. He stopped work for about half an hour, the pain subsided, and he then resumed working. There were no immediate manifestations of the injury; there was no break in the skin; "everything appeared to be all right." Petitioner reported the accident to his foreman. Five days later the area began to get sore, and the following day a "big hole" appeared at the elbow. Petitioner consulted a Dr. Higi who found two areas of radiodermatitis, characterized by atrophy and telangiectasia (growth of new blood vessels) in the left deltoid area (shoulder), left elbow and upper part of the left forearm. He also found an area of abrasion over the olecranon process of the left elbow, with considerable secondary infection characterized by edema, redness and heat. He treated petitioner for several weeks with wet packs, penicillin and ultraviolet ray. The inflammation responded slowly, the swelling subsided and the secondary infection cleared up, but the original area of the trauma (third accident) did not respond.
Dr. Higi became suspicious when the affected area grew larger, and consequently he performed a biopsy which showed *473 a squamous cell carcinoma. Realizing that plastic surgery was necessary, he referred petitioner to Dr. Conroy, a plastic surgeon. Dr. Higi's final diagnosis was radiodermatitis with squamous cell carcinoma, complicated by secondary infection. He attributed the radiodermatitis, which he said was incurable, to the exposure to fluoroscopy, and stated that the condition was a frequent cause of squamous cell carcinoma  "That's the danger sign." He said, further, that the abrasion to the elbow caused by the third accident provided the "portal of entry for the infectious process." Dr. Higi emphasized that no one gets radiodermatitis unless he is exposed to radiation, and that the two parts of petitioner's body which were so exposed had sustained that condition.
Dr. Conroy, to whom petitioner was referred by Dr. Higi, performed plastic surgery on the left elbow, excising a large ulcerated area together with surrounding damaged skin which showed radiation changes, applied a pedicle flap (skin graft) directly from petitioner's chest to the area, and then repaired the chest with a further graft from the right thigh. His diagnosis was squamous cell carcinoma of the skin and radiodermatitis of the left shoulder and left elbow, with ulceration of the elbow. He stated that radiodermatitis will, as a general rule, eventually progress to ulceration, breakdown and squamous cell carcinoma, and that in his opinion the third accident was just an "incidental thing." However, in answer to a direct question, he said he felt the third accident hastened the ulceration, but it very likely would not have caused any ulceration unless the skin was previously damaged.
On cross-examination Dr. Conroy attributed the radiodermatitis to fluoroscopy, and he repeated that the trauma of the third accident hastened the breakdown of the skin. He said that the would have advised petitioner to have his elbow resurfaced without the occasion of the ulcer, and he did advise him that his shoulder should be resurfaced. With respect to the present condition of the skin in the shoulder area, he said that the changes there were in no way related to the third accident. Dr. Conroy was asked to explain why, if an area affected by radiodermatitis will ulcerate without *474 trauma, the shoulder area (which was said to have been exposed to fluoroscopy for a greater length of time than the elbow) had not yet developed an ulcer. His answer was that X-ray damage depends upon the intensity of the X-ray and its duration, and that neither the patient nor he was competent to testify as to the relative intensity of the exposure in either area. He would not compare the extent of X-ray exposure in those areas. Asked to pinpoint the episode which necessitated the surgery he performed, he answered that the extensive radiation to the two areas damaged the skin, and the bump to the elbow precipitated the ulceration.
Dr. Keats, who testified for petitioner in addition to Doctors Higi and Conroy, stated that there was a causal relationship between the accidents and petitioner's present condition, but he was not prepared to say which of the three incidents resulted in the present disability. He admitted that he was not qualified in the field of radiodermatitis and refused to express an opinion as to the basic cause which required surgical intervention in the elbow area. Dr. Keats had examined petitioner after the second and again after the third accidents and declared it as an "obvious fact" that the disability had increased from 15% of total of the left arm to 33-1/3% as a result of the third accident.
Dr. Siegel, a traumatic surgeon, was called as a witness for Fireman's, the insurer for the first accident. Although he had examined petitioner after each of the three accidents, his testimony was of little or no value in determining the cause of petitioner's disability. On direct examination he testified that all of petitioner's trouble was due to the third accident which necessitated the operation, but on cross-examination he admitted that the elbow ulcer may not have developed if petitioner had not had radiodermatitis. His testimony indicated a lack of familiarity with radiodermatitis or its cause, and he admitted that radiodermatology was not within his speciality. He was unable to answer questions with respect to the relationship between fluoroscopy, radiodermatitis and carcinoma. Although he had noted pigmentary changes in the shoulder area after the first accident, described *475 as "freckling," he could not account for them or state what caused them; he was surprised to hear that they were radiodermatitis. The only value his testimony had was with regard to his estimate of the extent of petitioner's total disability, fixed at 15% of total, regardless of cause.
London & Lancashire, insurer on the second accident, presented Dr. Friedman, a specialist in the field of cancer research and radiation treatment. He had examined petitioner on the day of the hearing and had the benefit of an hypothetical question which included all the pertinent facts relating to the several accidents, their treatment, and the findings of the treating physicians. It was his opinion that the third accident induced secondary infection into the wound, with subsequent breakdown of the tissues and ulceration, leading to the surgical removal of the defective tissues. He attributed the radiodermatitis in the shoulder area to the fluoroscopic examinations following the first accident, and the radiodermatitis in the left elbow to those following the second accident. He recommended that the skin of the shoulder affected by radiodermatitis be excised and covered with a skin graft. When asked directly whether the fluoroscopy of the elbow, or the trauma to the elbow, had any relation to the shoulder condition, he replied that the matter was "a little bit complicated" and went on to say that in his opinion there should be two operations on the shoulder: first, a cleaning out of the lymph nodes in the axilla, because they might be harboring microscopic cancer cells from the elbow cancer, and the second the removal of the radiodermatitis skin from the back of the shoulder and its replacement with a skin graft. These two procedures, he said, are directed at two distinct processes, one not related to the other.
Dr. Gluckman, a specialist in industrial medicine and surgery, was called as an expert witness by Travelers, insurer for the third accident. He stated that the blow to the elbow in the third accident played no part in petitioner's condition, but that it was due to fluoroscopic over-exposure. He based this opinion on the fact that the third trauma caused neither a break in the skin nor immediate discoloration. Dr. Gluckman *476 could not differentiate between the effects of the periods of extended fluoroscopy following each of the first two accidents, but did say that if there was in fact a longer exposure to fluoroscopy in one incident as against the other, that "one might be incriminated to the extent of the duration of time being greater." Answering questions put by the deputy director, Dr. Gluckman developed the fact that in fluoroscopy there are direct rays as well as a "bounce effect" which cause the rays to penetrate the surrounding area.
It is appropriate to comment at this point that on cross-examination both Doctors Siegel and Gluckman failed intelligibly to explain the reasons for their respective exculpation of the causal materiality of the fluoroscopy in the one case and the trauma of the third accident in the other.
The testimony which we have summarized above was given before the deputy director on the hearing of three claims filed by petitioner; the first two asked for increased disability compensation from Fireman's and London & Lancashire, insurance carriers on the first two accidents, and the third sought compensation against Travelers for the third accident. The deputy found no increased disability from the first two accidents, and held that the third accident brought about the condition which necessitated an operation for removal of the squamous cell carcinoma and the skin graft. He charged Travelers with all hospital and medical expenses up to the time of the hearing, temporary disability, and the 20% increase in total permanent disability. He further found all three insurers responsible for any medical, surgical and hospital expenses that petitioner might require as a result of further exploratory operative intervention and skin graft to the left shoulder, indicated as necessary by Doctors Conroy and Friedman.
The County Court, after reviewing and analyzing the medical testimony at some length, arrived at a different allocation of liability and held all three insurers equally responsible for hospital and medical expenses, temporary disability and the increased 20% of total permanent disability. This determination was based on a finding that the evidence *477 preponderated in favor of the view that the three work-induced accidents which befell petitioner combined to produce all of his present increased disability. Finding no evidence that the third accident caused or contributed to any pathology which might be found in the shoulder as the result of contemplated surgery, the County Court, in the light of the testimony of Doctors Conroy and Friedman. Placed full responsibility for further operative care upon Fireman's and London & Lancashire.

II.
"Substantial evidence" is no longer the guiding criterion for appellate review of factual issues in workmen's compensation proceedings in this State. A finding of fact in the Workmen's Compensation Division or in the County Court does not lessen the duty of this court "to determine the facts and evaluate them by full investigation and analysis of the evidence so as to adjudge whether the general finding is consistent therewith, i.e., if upon such total consideration of the record and views expressed below, it is believed the judgment both in fact and the applicable law from which appeal is taken is correct, it should be affirmed; if the judgment is erroneous, it should be reversed or modified." Russo v. United States Trucking Corp, 26 N.J. 430, and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, both decided on April 3, 1958.
We find that the medical evidence clearly preponderates in favor of the view adopted by the County Court  that all three accidents combined to produce petitioner's present increased disability of 20% of total. Liability for this permanent disability, and for temporary disability, hospital, medical and surgical expenses, is allocable among the three insurers involved.
Where there are two or more successive and compensable injuries which combine to produce permanent injury, there should be apportionment among the employers to the degree that each contributes to the total result. See Bucuk *478 Edward A. Zusi Brass Foundry, 49 N.J. Super. 187, 207-208 (App. Div. 1958). It follows that there should be such an apportionment among insurance carriers where we have the unusual situation, here present, of successive accidents suffered while in the same employment, respectively incurred at a time when there was a different insurance carrier. The cases cited to us by London & Lancashire as standing for a contrary position actually support nothing more than the settled rule that a work-connected accident which aggravates a preexisting condition not related to the employment is compensable to the full extent of the resulting disability.
We find only one case in which a holding somewhat similar to the instant one was made. In Silberman v. National Egg and Product Co., 131 N.J.L. 286 (Sup. Ct. 1944), affirmed 132 N.J.L. 143 (E. & A. 1944), there was one employer, two accidents and two insurers. The petitioner suffered a back sprain on August 13, 1940, and a second back sprain on September 9 following. The former Supreme Court, speaking through Justice Heher, reversed the Court of Common Pleas, holding that there were two accidents, the second substantially aggravating the injury due to the first, and reinstated the award in the Compensation Bureau of 35% of total  allocating 10% to the first accident and 25% to the second. Essentially the same general factual situation obtains in the present case. The logical extension of the Silberman holding produces the result at which we have arrived. See Bucuk v. Edward A. Zusi Brass Foundry, above. It accords with logic and equity to place proportionate liability upon those whose employments combine causally to produce a total or partial total permanent disability.
Our view is in harmony with the great weight of authority. Employers' Cas. Co. v. United States Fidelity & Guar. Co., 214 Ark. 40, 214 S.W.2d 774 (Sup. Ct. 1948); Fireman's Fund Indem. Co. v. State Industrial Acc. Comm., 39 Cal.2d 831, 250 P.2d 148 (Sup. Ct. 1952); Mund v. Farmers' Cooperative, 139 Conn. 338, 94 A.2d 19 (Sup. Ct. Err. 1952); Walker v. Hogue, 67 Idaho 484, 185 P.2d 708 (Sup. Ct. 1947); Stansbury v. National Auto. & Cas. Ins. *479 Co., 52 So.2d 300 (La. Ct. App. 1951); Carpenter v. Arrowhead Steel Products Co., 194 Minn. 79, 259 N.W. 535 (Sup. Ct. 1935); Peniston v. City of Marshall, 192 Minn. 132, 255 N.W. 860 (Sup. Ct. 1934); Dunbar Fuel Co. v. Cassidy, 100 N.H. 397, 128 A.2d 904 (Sup. Ct. 1957); Meszaros v. Goldman, 307 N.Y. 296, 121 N.E.2d 232 (Ct. App. 1954); Anderson v. Babcock & Wilcox Co., 256 N.Y. 146, 175 N.E. 654 (Ct. App. 1931); Denver Producing & Refining Co. v. Phillips, 163 Okl. 106, 21 P.2d 42 (Sup. Ct. 1933); Merton Lbr. Co. v. Industrial Commission, 260 Wis. 109, 50 N.W.2d 42 (Sup. Ct. 1951); 2 Larson, Workmen's Compensation Law (1952, and Supp.), § 95.31, p. 478. Contra: In re Costa's Case, 333 Mass. 286, 130 N.E.2d 589 (Sup. Jud. Ct. 1955); Fitzpatrick's Case, 331 Mass. 298, 118 N.E.2d 774 (Sup. Jud. Ct. 1954); Brinkert v. Kalamazoo Vegetable Parchment Co., 297 Mich. 611, 298 N.W. 301 (Sup. Ct. 1941); Towner v. Western Contracting Corporation, 164 Neb. 235, 82 N.W.2d 253 (Sup. Ct. 1957).
The evidence in this case supports the finding that over-exposure to fluoroscopy after each of the first two accidents caused the radiodermatitis, and the trauma of the third accident precipitated the elbow ulceration with its squamous cell carcinoma, requiring surgery and skin-grafting. The disability upon which the first awards of March 25, 1955 were based was apparently not associated with the radiodermatitis, and certainly not with the carcinoma.
The difficult problem posed is to determine in what proportion each of the three accidents and their respective consequential treatments contributed to the total increased disability. There is an obvious gap in the proofs as to the actual dosage of fluoroscope rays given to petitioner by Dr. De Luca following each of the first two accidents, the manner in which the machine was used and particularly the positioning of petitioner's arm in relation to the fluoroscope screen, and the degree of sensitivity which petitioner had to such rays. Several of the medical experts pointed to these variables in discussing the radiodermatitis which petitioner *480 suffered as a result of over-exposure. It is therefore readily understandable why there was no proof as to how much each of the accidents and treatments which followed thereon contributed to the total condition, so as to provide an intelligible, factual basis for apportioning liability.
Did the fluoroscopy following the first accident cause more radiation burn than the treatment after the second, or is the reverse the case? What contribution did each make to the elbow area, producing a condition which needed only the elbow bump to set the malignancy in train? We are persuaded from a careful reading of the testimony that there was such a contribution to adjacent areas. The rays from the fluoroscope machine not only directly affected the immediate area exposed but had a peripheral effect, whether we denote it as a "bounce effect," scatter phenomenon, or otherwise.
In short, the expert evidence adduced at the hearing before the deputy director does not furnish a precise basis for allocating the proportionate contributive share of the final resulting disability among the three accidents and their respective treatment sequelae. A possible solution would be to remand the matter to the Division for the taking of additional testimony, but this would present obvious and apparently insurmountable difficulties. Only Dr. De Luca could supply the details basic to the expert medical testimony which other doctors would be called upon to give. This assumes that he made a careful record on the occasion of each treatment as to dosage, position of petitioner's arm, time of exposure and other factors pertinent to fluoroscopic treatment. It also assumes that he would voluntarily or forthrightly testify to the manner in which he carried out his fluoroscopic operations  work which, in the light of its after-effects, can most charitably be described as having been done in apparent total disregard of procedures essential to patient safety. We strongly doubt whether a remand would produce a better basis for an accurate distribution of liability. Indeed, we are compelled to that conclusion by a careful review of the medical proofs and the manner in which they *481 were developed by the skilled counsel who participated in the examination of the medical experts.
We have found, as indicated above, that each of the three accident episodes did contribute substantially to the final condition of disability. We therefore conclude that the interests of justice will best be served and an equitable and practical result achieved by affirming the determination of the County Court which apportioned the expenses attendant upon the last incident, the temporary disability, and the increased disability equally among the three insurance companies.

III.
Two other aspects of the appeal present little difficulty. The first has to do with the resurfacing of the shoulder area made necessary by the radiodermatitis induced by fluoroscopy. Here the cost of the operation, which has been performed since the date of the hearing in the Division, will be borne by the first two insurers, Fireman's and London & Lancashire  in equal proportions for the same reasons expressed in connection with the main question of allocation of liability. The second problem relates to the cost of cleaning out the lymph nodes in the axilla, as recommended by Dr. Friedman. This will be paid by all three insurers because here, as revealed by the testimony, the need for the operation is causally connected with the third accident  the nodes may be harboring cells thrown off by the carcinoma at the elbow. The cost will be shared equally.
As modified in this last respect, the judgment of the County Court is affirmed.