91 N.J. Super. 433 (1966)
221 A.2d 27
CHARLES SCHNAARS, PETITIONER-APPELLANT,
v.
CANFIELD OIL CO. (SELF-INSURED), RESPONDENT-RESPONDENT, AND CANFIELD OIL CO. (IMPLEADING N.J.M., FORMER INSURANCE CARRIER), RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 16, 1966.
Decided June 13, 1966.
*435 Before Judges SULLIVAN, LEWIS and KOLOVSKY.
Mr. Patrick F. McDevitt argued the cause for appellant (Messrs. Reich & McDevitt, attorneys).
Mr. Isidor Kalisch argued the cause for respondent New Jersey Manufacturers Insurance Company.
Mr. Fred S. Brause, Jr. argued the cause for respondent Canfield Oil Co. (Messrs. Brause, Callaghan & Coyle, attorneys).
The opinion of the court was delivered by KOLOVSKY, J.A.D.
From some time prior to June 1955 until December 1960 petitioner was employed by Canfield Oil Company (Canfield). From December 1960 until January 1962 he was unemployed. Since then he has been employed as a bartender in Basil's Tavern, owned by a relative. New Jersey Manufacturers Insurance Company (NJM) was Canfield's workmen's compensation insurance carrier until November 30, 1957; thereafter, Canfield became a self-insurer.
On September 20, 1957, in a proceeding instituted by petitioner against Canfield, Deputy Director Kerner of the Division of Workmen's Compensation found:
"that in the month of June 1955 petitioner had suffered an injury to the palm of the right hand which apparently consisted of some slight minimal penetrating wound inflicted by a screw driver, and subsquent thereto the petitioner suffered an occupational condition of both hands by the application of pressure causing Dupuytren's Contracture in the right hand and aggravating a previous pre-existing Dupuytren's Contracture in the left hand, which was the subject of operative intervention in October of 1953.
The physical application of pressure which was involved took place in the opening and closing of valves and applying covers and caps to cans and other containers.

* * * * * * * *
There is * * * attributable to both the accident and the occupational pressure that has been described, a permanent disability of fifteen per cent of total. * * *
*436 This award of permanent disability in terms of total permanent disability is predicated upon a disability of approximately ten per cent to twelve and a half per cent partial permanent disability in the right hand, and approximately twenty per cent partial permanent disability in the left hand, due to the accident involving the screw driver in the right hand, and due to the occupational conditions following the screw driver injury and his occupational condition I have described."
On September 19, 1959, petitioner filed an application for review or modification of the original award against Canfield, naming NJM as the latter's insurance carrier and alleging an increase in the deformity of each hand. On learning that NJM no longer insured Canfield, petitioner on February 19, 1960 filed an original claim petition for compensation against Canfield, naming it as self-insurer. The former petition merely described the worsening of the condition since the original award; the latter, in addition, alleged:
"I have continued doing the same type of work that I was doing at and prior to the time of the original award. Because I continued to constantly use my hands, the condition in my hands has worsened."
Proceedings on the two petitions were consolidated for trial before Judge Kelly of the Division of Workmen's Compensation on April 21, 1961. He found that petitioner's disability had increased by 15%; that "rather than increased disability due to the original exposure, there is an increase in disability due to additional exposure," of which 5% was due to exposure until November 30, 1957 when NJM ceased to be Canfield's insurance carrier, and that the remaining 10% was brought about by the additional occupational use and exposure from November 30, 1957 up to December 1960 when employment ceased. No appeal was taken from this determination. NJM paid the additional 5%; Canfield, as self-insurer, paid the additional 10%.
It may be noted that in neither the original 1957 award nor in the 1961 proceedings did the Division determine that petitioner's condition was fixed or static. Cf. Ort v. Taylor-Wharton *437 Co., Division of Harsco Corporation, 47 N.J. 198 (1966).
On March 22 and May 22, 1962, respectively, petitioner filed separate petitions for review or modification against Canfield, the former naming NJM as the insurer, the latter Canfield as self-insurer. Each petition alleged, "The condition in both of my hands, known as Dupuytren's Contracture has become progressively worse." The two proceedings were consolidated and tried before Judge Kelly in the Division on March 31 and December 15, 1964.
In an opinion rendered January 11, 1965 Judge Kelly found that the petitioner had "sustained an increased permanent disability of 12 1/2% of permanent partial disability as a result of his occupational injury"; that "the nature of petitioner's present employment as a bartender, hired by a relative, under favored conditions, is not a factor of causation, aggravation or contribution to petitioner's Dupuytren's Contracture of both hands"; and that the increase which had occurred "since the last period of exposure alleged" (December 1960) is chargeable solely to Canfield as self-insurer. Citing Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308 (1964), Judge Kelly ruled that "an apportionment of causal relationship could not be accurately ascribed" as between the employment during the period when NJM was the insurer and the later employment during the period when Canfield was self-insurer, so that full responsibility for the increase was to be imposed on Canfield in its uninsured status.
Judgment was entered awarding petitioner increased disability of 12 1/2% to be paid by Canfield as self-insurer; Canfield was ordered to furnish surgery if petitioner requested it; the petition directed to NJM was dismissed. Canfield appealed to the County Court.
After reviewing the record, the County Court judge also found a 12 1/2% increase in disability. But contrary to the finding made by the Division, he found and determined "that the duties performed by the petitioner in his employment *438 [as bartender] at Basil's did substantially contribute to his increased disability of 12 1/2% of partial total." On the basis of that finding, he construed Bond, supra, as requiring Basil's Tavern to bear the responsibility for the increase in disability, with Canfield being exonerated. However, Basil's Tavern was not a party to the litigation; no award could be made against it. Judgment was entered in the County Court dismissing both of petitioner's applications for review. Petitioner appeals.
The question here presented is one aspect of the problems arising in occupational disease cases when the disabled employee, or the employee suffering increased disability, has had several employers, or his employer has had successive insurance carriers.
Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308 (1964), cited by both the Division and the County Court, has no application to the problem here presented  responsibility for an increase in disability after an original award for a disabling occupational disease. Rather, Bond deals with the situation where an original award is sought following the first occurrence of disability, where
"an employee is exposed to work conditions which activate or cause a progressive occupational disease, and the existence of such disease remains undisclosed and unknown over a period of time * * *."
In such a situation, Bond imposes liability on
"* * * that employer or carrier during whose employment or coverage the disease was disclosed as above noted, i.e., by medical examination, work incapacity, or manifest loss of physical function."
See also Textileather Corp. v. Great American, etc., Co., 108 N.J.L. 121 (E. & A. 1931); Bucuk v. Edward A. Zusi Brass Foundry, 49 N.J. Super. 187, 201-207 (App. Div. 1958), certification denied 27 N.J. 398 (1958).
But where the question involved is responsibility among successive employers or insurance carriers for an increase *439 in disability subsequent to an original award for an occupational disease, the cause of the increased disability is the determinative factor in imposing liability for such increase, in whole or in part.
As the court said in Ort v. Taylor-Wharton Co., Division of Harsco Corporation, 47 N.J. 198 (decided May 23, 1966):
"* * * in Calabria v. Liberty Mutual Insurance Co., 4 N.J. 64, 71 (1950), this Court indicated that if increased disability results from continued exposure, as distinguished from the natural progress of the disease, an award against a subsequent carrier would be in order. On the other hand, if the increased disability followed as the natural progress of the disease, the first carrier, or the first employer, if the employment had been changed after the original award, would be held responsible. See, 2 Larson, Workmen's Compensation Law, § 95.26 (1961)."
Further, while we recognize the more difficult problems of proof involved, in our opinion, if the increased disability is chargeable both to the natural progress of the disease and continued exposure, liability for the increased disability is to be apportioned between the original employer or carrier and the subsequent employer or carrier in the proportions that the increase is chargeable to each cause, natural progression or continued exposure, respectively. Cf. Quinn v. Automatic Sprinkler Co., 50 N.J. Super. 468, 478 (App. Div. 1958); see Bahry v. Nu-Glamore Beauty Salon, 4 A.D.2d 351, 164 N.Y.S.2d 676, 679 (App. Div. 1957) motion for leave to appeal denied 3 N.Y.2d 707, 166 N.Y.S.2d LVIII, 145 N.E.2d 385 (Ct. App. 1957). The burden of proving the causal relationships and the respective effects thereof is, of course, on petitioner. Schiffres v. Kittatinny Lodge, Inc., 39 N.J. 139, 149 (1963).
The County Court found that petitioner's employment as bartender "did substantially contribute to his increased disability," and deeming Bond, supra, as controlling, made no finding or reference to the degree of contribution vis-a-vis the natural progression of the disease. As we have ruled, the *440 reliance on Bond was misplaced; further, we question whether the medical testimony of Dr. Emmer and Dr. Firtel on which it is based offers sufficient support for a finding as to the causal relationship between petitioner's duties as bartender and his increased disability.
At the hearing of March 31, 1964, Dr. Firtel was offered as a witness by counsel representing NJM. He was called out of turn, testifying before petitioner. He had not testified in either of the prior proceedings, but had examined petitioner in December 1959, February 1963 and on March 31, 1964. In his opinion the disability of the right hand had not increased between 1959 and 1963, remaining at 7 1/2%, but by 1964 it had increased to 33%. With respect to the left hand, he found an increase in disability from 5% to 33% between 1959 and 1963, and a further increase to 66 2/3% by 1964.
But his testimony offers but little, if any, aid to the determination of the causal relationship of petitioner's present employment as bartender  he was not given the details thereof  to the increase in disability, or to the relative effect of the prior employment and natural progression. He acknowledged the existence of contradictory medical theories as to the possibility of occupational cause of Dupuytren's Contracture. He opined that the disease will usually progress, although,
"there comes a stage where these conditions burn themselves out and they become stationary. Whether that has occurred in this man or not, I don't know. I would say that based upon the degree of increase in the relatively short time since I last saw him that we might anticipate that there may be some further progression. Of course, this is pure speculation based upon what has happened in the times that I have seen him."
Again,
"[while] * * * this may be a progressive condition * * * aggravation of the condition by trauma to the palmar facia will definitely hasten or increase any progression that one might expect. Once the condition is initiated, further trauma will aggravate the condition.
Q. Doctor, that further trauma  might that be of a lesser trauma than would originally cause the condition to be initiated?

*441 * * * * * * * *
I think I can answer that question simply by saying we don't know how much trauma it takes initially to cause it, if we are going to relate it to trauma."
Dr. Emmer, who testified on behalf of Canfield, had also testified at the April 1961 hearing. He had examined petitioner in 1960, on April 21, 1961, July 13, 1962, February 1, 1963 and March 31, 1964. On each examination, he found increased disability of each hand. In 1960 the disability of the right hand was 10%, the left hand 20%; in 1964 the disability of the right hand had increased to 35%, the left hand to 50%.
At the April 1961 hearing, he testified:
"Q. In your opinion, Doctor, is employment requiring the use of the hands a contributing factor in causing or aggravating a Dupuytren's contracture?

* * * * * * * *
THE WITNESS:
My medical opinion is that there is no relationship between his occupation and the progression or causation or acceleration or aggravation of the Dupuytren's.
Q. Now, Doctor, where you have a Dupuytren's contracture condition, would that condition progress in the absence of any trauma or any work with the hands?
A. Dupuytren's progresses whether the patient is a bookkeeper, an industrial worker, a capitalist, a broker, or a politician. The progress is inevitable. I don't know of any method of treatment that has yet been devised that has slowed progression."
At the March 31, 1964 hearing, Dr. Emmer was still of the same opinion but acknowledged that our courts have ruled to the contrary, see e.g. Walsh v. Kotler, 43 N.J. Super. 139 (Cty. Ct. 1956), affirmed 46 N.J. Super. 206 (App. Div. 1957), as did the Division in the original 1957 proceedings in this case. On that basis, he testified,
"* * *. The Court's having construed that my medical opinion carries no weight in this particular case, it has been definitely legally determined that there was causal relationship.
Carrying that assumption to a logical inference and conclusion, it appears to me that the original exposure started a chain, and this *442 chain reaction has continued from that particular time on to the present time and is still in a phase of activity. And this is proven by the facts in the hypothetical question and by the testimony I have heard from the patient, namely that even during the period when he was not employed he stated that his condition progressed.
Q. Just one further question, Doctor: You heard the man testify both on direct and cross-examination with respect to his activities in his present job. In your opinion, Doctor, do those activities materially contribute to the increase in disability which he is presently suffering?
A. If I were to adopt another hypothesis, namely, that every exposure contributes to his work, then I would of necessity have to accept the logical inference that even this work has contributed not slightly but materially to his present condition."
We find a similar lack of evidential support for the finding made by the compensation judge that petitioner's employment as a bartender "is not a factor of causation, aggravation or contribution" to the increase. The only evidence supporting that finding, Dr. Visconti's answer to a hypothetical question, is entitled to little or no weight; the hypothetical question did not embrace significant activities of petitioner's present employment as bartender and the involvement of his hands therein. Cf. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295 (1954). Petitioner's testimony was interrupted prior to his cross-examination to permit Dr. Visconti to testify. The full scope of petitioner's activities as bartender was thereafter fully developed on cross-examination. Nor was any attempt made to ascertain what portion, if any, of the increase in disability since 1961, if due to natural progress as Dr. Visconti testified, is attributable to the original disability for which an award was made in 1957 against Canfield and what portion, if any, is attributable to petitioner's continued employment with Canfield from November 30, 1957 to December 1960.
It is significant to note that at the April 21, 1961 hearing, Dr. Visconti testified on direct examination:
"Q. Doctor, in your opinion, is there a causal relationship between the occupational condition of the man's hands as first found by you and as last found by you, particularly in view of the fact that *443 the man worked subsequent to September 20, 1957 right up until December of 1960, doing work which required the constant use of his hands?
A. Yes.
I would rather put the answer in this fashion: that the manual use of his hands in his occupation contributed to the maturation ripening of the Dupuytren's contracture in both hands, which is a condition peculiar to the individual who has such an individual propensity."
And on cross-examination:
"Q. Doctor, assuming that the incipient Dupuytren's contracture has been set off, or aggravated, or caused, if you will, by the employment conditions, as testified to at the time of the first hearing, would that condition progress in the absence of any further exposure?
A. Yes.
Q. And, Doctor, is there any known medical or scientific basis on which to predict or establish what that rate of progression would be in advance of it occurring?
A. No. All except one thing, that the manual use of the hands, an occupation requiring the use of the hands, does contribute effectively to its progression."
From our own review of the record, we conclude that the medical testimony before the Division, and on appeal before the County Court, was not such as to permit resolution of the critical issues of causation and apportionment of liability, if any. The interests of justice require that the matter be remanded to the Division of Workmen's Compensation for a trial de novo at which essential instructive medical testimony may be developed. Cf. Aladits v. Simmons Company, 47 N.J. 115 (1966); Garden State Farms, Inc. v. Hoffman, 46 N.J. 595 (1966). Equally essential, in view of the possible liability of Basil's Tavern, is that it be made a party to the litigation, cf. N.J.S.A. 34:15-50. At oral argument, petitioner represented that he would file a petition against Basil's Tavern; that action should be consolidated for trial with the present proceedings.
Reversed and remanded to the Division of Workmen's Compensation. We do not retain jurisdiction.